1   NICHOLAS J. BEGAKIS (SBN 253588)
    nicholas.begakis@faegredrinker.com
2   FAEGRE DRINKER BIDDLE & REATH LLP
    1800 Century Park East, Suite 1500
3   Los Angeles, California 90067
    Telephone:+1 310 203 4000
4   Facsimile: +1 310 229 1285

5   Attorneys for Third-Party Subpoena Respondent
    TIKTOK INC.

6
    NIMA GHARAVI
7   nima@midwestwrestle.com
    4610 North Clark Street, St. 1098
8   Chicago, Illinois 60640

9   Plaintiff *Pro Se*

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  NIMA GHARAVI,                          Case No. Civil Action No. 2:25-mc-
                                           00002-UA
14                  Plaintiffs,
                                           **MEMORANDUM OF POINTS
15          v.                             AND AUTHORITIES IN
                                           SUPPORT OF THE JOINT
16  TIKTOK INC., TIKTOK LTD.,              STIPULATION REGARDING
    TIKTOK PTE. LTD., and TIKTOK U.S.      TIKTOK INC.'S REQUEST FOR
17  DATA SECURITY INC.,                    ENTRY OF A PROTECTIVE
                                           ORDER**
18                  Third-Party Subpoena
                    Respondents.           Date: May 23, 2025
19                                         Time: 9:30 a.m.
                                           Hon.: Judge Dolly M. Gee
20                                         Discovery Cut-Off: N/A
                                           Pretrial Conference: N/A
21                                         Trial Date: N/A

22

23

24

25

26

27

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

# **TABLE OF CONTENTS**

TIKTOK INC.'S POSITION..................................................................................1

    I.      INTRODUCTION ............................................................1

    II.     RELEVANT FACTS ..........................................................3

          A.    Plaintiff's DMCA Claims and Subpoena ....................3

          B.    Plaintiff's Refusal to Stipulate to a Protective Order ................3

    III.    STANDARD ...................................................................3

    IV.    ARGUMENT ..................................................................4

    V.     CONCLUSION ................................................................5

PLAINTIFF NIMA GHARAVI'S POSITION ...............................................6

    I.      PLAINTIFF'S INTRODUCTION..........................................6

    II.     FACTUAL BACKGROUND ................................................7

    III.    LEGAL STANDARD ........................................................8

          A.    Motion for Protective Order ...........................................8

          B.    DMCA Section 512(c) Safe Harbor ...........................9

    IV.    ARGUMENTS ................................................................10

          A.    TTI's Cited Cases Are Inapposite ............................10

          B.    TTI's Motion Seeks an Improper Advisory Opinion................15

          C.    TTI Mischaracterizes User Notification Procedures ................17

          D.    The DMCA Already Provides Adequate Safeguards................18

          E.    No Expectation of Privacy in BSI ............................18

          F.    Filing Under Seal Is Unduly Burdensome.................20

          G.    Precedent Favors Enforcement Without Protective Orders .....21

          H.    TTI's Dilatory Tactics ...................................................22

          I.    TTI's Financial Interest in Infringing Content.........................25

    V.     CONCLUSION ................................................................27

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

i

Pursuant to Local Rule 37, TikTok Inc. ("TTI") and Pro Se Plaintiff Nima Gharavi ("Plaintiff") file the instant Joint Stipulation regarding TTI's Request for the Entry of a Protective Order. TTI's and Plaintiff's only dispute is whether a protective order should be entered before TTI's production of basic subscriber information ("BSI") in response to Plaintiff's third-party subpoena.

**TIKTOK INC.'S POSITION**

## I.    <u>INTRODUCTION</u>

Plaintiff served a subpoena under the Digital Copyright Millennium Act ("DMCA"), 17 U.S.C. § 512(h), requesting information to identify the owners of 22 TikTok accounts. He intends to use this information to pursue copyright claims against the account owners. TTI conferred with Plaintiff regarding his subpoena and agreed to produce responsive BSI for the TikTok accounts subject to a protective order. The BSI production for each account may include information that could be used to identify and contact the user, including usernames, email addresses, and phone numbers.

There is no dispute regarding what information will be produced. TTI's and Plaintiff's only disagreement is whether a protective order should be entered before the BSI production. The accounts are those of nonparties, who are unable to assert objections or raise other issues in response to the subpoena.

TTI frequently receives subpoenas requesting production of BSI to identify account owners. Under similar circumstances, courts in many jurisdictions across the country, including district courts in the Ninth Circuit, have consistently entered protective orders similar to what TTI proposes in this case. TTI sent Plaintiff its standard protective order used for these purposes, and offered to confer regarding its terms to ensure Plaintiff is able to effectively use the information in pursuing his claims. To be clear, TTI in no way attempts to prohibit Plaintiff from obtaining BSI, frustrate the purposes of 17 U.S.C. § 512(h), or limit Plaintiff's ability to pursue his

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

copyright claims. Plaintiff, however, refuses to consider any protective order, which forms the basis for this filing.

Good cause exists for entry of a protective order, and pro se Plaintiff's position is inconsistent with decisions of federal courts across the country under similar circumstances. Many judges have recognized the benefit of reasonably safeguarding the interests of currently unknown individuals with no ability to object, identify currently unknown issues, or assert their position in relation to the public and unrestrained disclosure of their BSI. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 18-cv-02019, 2018 WL 10604533, at *3 (N.D. Cal. Sept. 14, 2018); *Hard Drive Productions v. Does 1-48*, No. 11-cv-9062, 2012 WL 2196038, at *6 (N.D. Ill. June 14, 2012); *After II Movie, LLC v. Grande Comms. Networks LLC*, No. 1:21-cv-00709, 2023 WL 3094122, at *2 (W.D. Tex. Apr. 26, 2023); *Strike 3 Holdings, LLC v. Doe*, No. 4:22-cv-879, 2023 WL 4922590, at *3 (E.D. Tex. Aug. 1, 2023).

Further, TTI's position is consistent with this court's prior guidance in *Mintz v. Mark Bartelstein & Assocs., Inc.*, 885 F.Supp.2d 987 (C.D. Cal. Aug. 14, 2012). In *Mintz*, this court required production of subscriber information, but balanced the parties' interests and held any concerns by the disclosing party "can be adequately protected with an appropriate protective order." *Id.* at 1000. As requested here by TTI, the *Mintz* court required the parties to submit a stipulated protective order, which would be entered before the subscriber information was produced. *Id.*

Neither party to the subpoena knows the account owners, their position(s) on the public disclosure of subscriber information, or (as more fully discussed below) other unique circumstances that may apply. There is currently no benefit to upending established procedures to allow Plaintiff an unbridled ability to publish this information without restraint. Under TTI's proposal, Plaintiff will receive this information, be able to use it in pursuing his claims, and will experience no prejudice in this matter. TTI, therefore, requests that the Court enter the protective order attached to the Declaration of Nicholas J. Begakis ("Begakis Decl.") as **Exhibit A**.

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

## II. RELEVANT FACTS

### A. Plaintiff's DMCA Claims and Subpoena

Plaintiff filed a request to the Clerk for Issuance of a Subpoena Pursuant to 17 U.S.C. § 512(h) to identify alleged copyright infringers of Plaintiff's wrestling content. *See* Doc. 1. Plaintiff served a subpoena under Federal Rule of Civil Procedure 45 and 17 U.S.C. § 512(h) addressed to TTI, TikTok Pte. Ltd, and TikTok U.S. Data Security Inc. ("Subpoena"). Begakis Decl., ¶ 2. TTI informed Plaintiff it was the correct entity for service, and the Parties agreed other entities that received the subpoena would have no obligation to provide a further response. *Id.* ¶ 3.

TTI's counsel has on multiple occasions conferred with the pro se Plaintiff about the Subpoena's scope, including a Local Rule 37-1 prefiling conference of counsel on April 10, 2025. *Id.* ¶ 4. TTI and Plaintiff agreed the Subpoena's scope would be limited to the production of BSI for the identified accounts. *Id.* ¶ 5.

### B. Plaintiff's Refusal to Stipulate to a Protective Order

During the conferrals, including the Rule 37-1 conference, TTI agreed to produce the BSI subject to a protective order and said it was willing to confer regarding any edits Plaintiff believed were necessary to pursue his claims. But pro se Plaintiff consistently refused to agree to entry of any protective order. *Id.* ¶ 6. During conferrals, TTI's counsel explained much of the information and arguments contained in this Stipulation, including that a protective order is common for BSI productions, especially when the account owners are unknown and unable to assert objections. *Id.* ¶ 7. Plaintiff took the position that he will need to use this information to identify and pursue claims against the account owners and, therefore, it should not be subject to any disclosure restrictions. *Id.* ¶ 8.

## III. STANDARD

"Third party subpoenas under Federal Rule of Civil Procedure 45 are also subject to the limitations of Federal Rule of Civil Procedure 26." *Jacoby v. Board of Supervisors of Univ. of La. System*, 709 F.Supp.3d 1087, 1090 (E.D. Cal. 2023). After

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

a party moves for the entry of a protective order, the trial court may grant the request to protect persons from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). Protective orders are necessary to protect parties and witnesses in view of broad discovery rights. *U.S. v. CBS, Inc.*, 666 F.2d 364, 368-39 (9th Cir. 1982). The party moving for a protective order must show there is "good cause" for its issuance. Fed. R. Civ. P. 26(c)(1).

These concerns are particularly applicable for third parties responding to subpoenas. Indeed, Rule 45(d)(1) emphasizes that parties "responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." District courts "must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." *Id.*; *see also Jacoby*, 709 F.Supp. at 1089 ("The Federal Rules specifically require parties to avoid creating undue burdens on third parties via subpoenas.").

## IV.   ARGUMENT

Good cause exists for entry of a protective order. TTI seeks to protect the unknown account owners from unnecessary annoyance, embarrassment, or oppression caused by the unrestrained disclosure of their BSI, and proactively safeguard against any potential unknown issues. This position is consistent with decisions from many federal courts, which have entered protective orders when a subpoena is issued for subscriber information to identify potential defendants.

For example, in *Strike 3 Holdings, LLC v. John Doe*, No. 18-cv-02019, 2019 WL 591460 (N.D. Cal. Feb. 13, 2019), the Northern District of California entered a protective order *sua sponte* to protect internet service provider users who may have infringed on a motion picture producer's copyrighted material. *Id.* at *3. The Northern District of California found a protective order was warranted for two reasons. First, the court sought to protect potentially innocent third parties, who may not have been the individuals that infringed on plaintiff's copyright, as the actual

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

4

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

infringer may have impermissibly used the subscriber's IP address to access copyrighted files. *Id.* Second, since the plaintiff alleged the user illegally downloaded adult motion pictures, the court acknowledged a future defendant may want to proceed pseudonymously where "necessary to preserve privacy in a matter of a sensitive and highly personal nature." *Id.* Courts around the country have entered protective orders in similar circumstances. *See, e.g.*, *Strike 3 Holdings, LLC* , 740 F. Supp. 3d at 127 (requiring protective order before production of subscriber information to identify alleged copyright infringer); *Strike 3 Holdings, LLC*, 2023 WL 4922590, at *4 (entering protective order "to protect the respective interests of the parties and non-parties").

Like the subpoenas at issue in those cases, TikTok requests a protective order here to safeguard information from currently unknown individuals who are unable to protect their rights. This Court should take this reasonable step to protect the information of potentially innocent third parties, who may not even be the people who allegedly infringed on Plaintiff's copyright. *See Strike 3 Holdings, LLC*, 2019 WL 591460, at *3. Whether they are ultimately able to proceed anonymously and whether other potential objections may exist are issues this Court does not need to decide at this time. Entering a protective order at this stage is a reasonable step to protect against currently unknown interests, objections, and other issues for the unidentified parties. Accordingly, good cause exists for the Court to issue a protective order prior to TTI producing BSI.

## V.    **CONCLUSION**

For the foregoing reasons, TTI respectfully requests the Court enter the protective order attached as Exhibit A before TTI produces BSI in this case.

5

1                             **PLAINTIFF NIMA GHARAVI'S POSITION**

2 **I.**    **PLAINTIFF'S INTRODUCTION**

3      TikTok Inc.'s ("TTI") motion for a protective order represents an unwarranted

4 attempt to impose burdensome restrictions on basic subscriber information ("BSI")

5 that should be readily produced in response to a valid DMCA subpoena. At its core,

6 TTI's position rests on a fundamental mischaracterization of both the applicable law

7 and the nature of DMCA subpoenas.

8      The DMCA subpoena mechanism was specifically designed by Congress to

9 provide copyright holders with an efficient means to identify alleged infringers while

10 incorporating appropriate safeguards. TTI's motion ignores these statutory

11 protections and instead seeks to impose an unnecessary and onerous 14-page

12 protective order modeled on complex trade secret litigation—a remedy entirely

13 disproportionate to the straightforward disclosure of basic subscriber information.

14      Notably, TTI fails to cite a single case in which a court granted a protective

15 order over a plaintiff's objection in response to a DMCA subpoena. This omission is

16 telling. Instead, TTI relies exclusively on cases involving Section 512(a) Internet

17 Service Providers ("ISP"), adult content publishers, and mass copyright litigants—

18 all materially distinguishable from the present matter. TTI's attempt to conflate these

19 disparate contexts obscures the critical fact that DMCA subpoenas already contain

20 built-in protections under 17 U.S.C. § 512(h)(2)(C), which requires "a sworn

21 declaration to the effect that the purpose for which the subpoena is sought is to obtain

22 the identity of an alleged infringer and that such information will only be used for the

23 purpose of protecting rights under this title."

24      TTI's insistence on a protective order is not motivated by legitimate privacy

25 concerns but appears to be part of a pattern of dilatory tactics designed to frustrate

26 copyright enforcement. As a *pro se* litigant and small content creator, Plaintiff has

27 already suffered significant delays and incurred substantial opportunity costs in

28 pursuing this matter. TTI's blanket policy of requiring protective orders for *all* BSI

FAEGRE DRINKER BIDDLE &<br>REATH LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

6

productions regardless of good cause under Fed. R. Civ. P. 26(c)(1) imposes an undue burden on copyright holders and undermines the expedited enforcement mechanism that Congress intended the DMCA to provide.

For these reasons, and as detailed more fully below, TTI's motion for a protective order should be denied, and TTI should be ordered to comply with the DMCA subpoena forthwith.

## II.   FACTUAL BACKGROUND

On January 13, 2025, Plaintiff obtained a DMCA subpoena from the Central District of California. Gharavi Decl., Ex. B, ¶ 1. The subpoena was served on TTI on January 18, 2025, via certified mail, and was received by TTI on January 27, 2025. Gharavi Decl., Ex. B, ¶¶ 2-3. TTI acknowledged receipt of the subpoena on January 30, 2025, and requested a two-week extension, which Plaintiff granted. Gharavi Decl., Ex. B, ¶ 4, Ex. 1.

On February 11, 2025, Plaintiff had a phone call with TTI's counsel, Bryan D. Pasciak. During our February 11, 2025 call, Pasciak requested an "indefinite extension" and stated that TTI requires confidentiality agreements for all BSI productions. Gharavi Decl., Ex. B, ¶ 5. Plaintiff declined both the indefinite extension (though agreeing to a second two-week extension) and the confidentiality agreement, citing that 17 U.S.C. 512(h)(2)(C) already provides statutory safeguards. Gharavi Decl., Ex. B, ¶ 6.

On February 14, 2025, Pasciak sent Plaintiff an email stating that "TikTok needs a confidentiality order to protect itself." Gharavi Decl., Ex. B, ¶ 7, Ex. 2. On February 27, 2025, Pasciak sent Plaintiff another email stating that requiring a confidentiality agreement is "our practice in responding to all subpoenas requesting this information." Gharavi Decl., Ex. B, ¶ 8, Ex. 3.

On March 11, 2025, Pasciak informed Plaintiff of TTI's intent to file a Motion for Protective Order. Gharavi Decl., Ex. B, ¶ 9. Plaintiff responded by inquiring about the in-person meet and confer requirement, given our shared location in Cook

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

County, Illinois. Gharavi Decl., Ex. B, ¶ 10. Pasciak replied on March 18, 2025, stating that his LA colleague (presumably Kendal C. Mitchell, whom he had copied on previous correspondence) would handle the filing. Gharavi Decl., Ex. B, ¶ 11.

Plaintiff immediately reached out to Mitchell on March 18, 2025, but as of April 5, 2025, it has been well over 10 days since Plaintiff reached out to Mitchell, and to this day Plaintiff has still heard nothing back from Mitchell. Gharavi Decl., Ex. B, ¶ 12.

Having established the factual context, Plaintiff now turns to the legal arguments that demonstrate why TTI's motion for a protective order should be denied.

## III.   LEGAL STANDARD

### A.   Motion for Protective Order

As the party seeking a protective order, TTI "must show 'good cause' to protect the moving party from 'annoyance, embarrassment, oppression, or undue burden or expense.'" *Al Indus., Inc. v. EnvisionTEC, Inc.*, 2020 WL 13200196, at *1 (C.D. Cal. Dec. 29, 2020). Good cause requires the movant to demonstrate "specific prejudice or harm" if no protective order is granted. *Id.* (quoting *Phillips ex rel Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)). "Broad unsubstantial allegations of harm are not sufficient." *Id.* TTI makes no effort at all to meet this standard. Indeed, outside of its section titled "Standard", TTI does not even mention undue burden or expense, nor does it claim that it would suffer any specific prejudice or harm from compliance with the subpoena. The irony of TTI expending the entirety of its legal standard section on making the case against undue burdens is that we find ourselves before the court primarily because TTI wants the court to sanction its blanket policy of forcing procedural hurdles unsupported by law upon all rightsholders regardless of good cause. Given that the only party creating an undue burden here is TTI, it appears counsel for TTI is actually representing Plaintiff's interests over Defendant's. TTI could have ended this matter months ago had it

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

simply complied with its statutory obligations under the valid and enforceable
subpoena.

### B. DMCA Section 512(c) Safe Harbor

*DMCA Section 512(c) limits a service provider's liability for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider. A service provider that meets the threshold conditions of Section 512(i) then qualifies for safe harbor under Section 512(c) if it:*

*(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;*

*(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or*

*(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;*

*(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and*

*(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.*

*17 U.S.C. § 512(c)(1)(A)-(C). In essence, a service provider is eligible for safe harbor under section 512(c) if it (1) does not know of infringement; or (2) acts expeditiously to remove or disable access to the material when it (a) has actual knowledge, (b) is aware of facts or circumstances from which infringing activity is apparent, or (c) has received DMCA-compliant notice; and (3) either does not have the right and ability to control the infringing activity, or—if it does—that it does not receive a financial benefit directly attributable to the infringing activity.*

*Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1145–46 (N.D. Cal. 2008) ("*Io Group*") (cleaned up)

With these legal standards in mind, Plaintiff will now address the specific arguments demonstrating why TTI's motion for a protective order should be denied.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

## IV.    **ARGUMENTS**

### A.    **TTI's Cited Cases Are Inapposite**

TTI's motion cites several cases in an attempt to support the unfounded assertion that "courts around the county" routinely order the use of trade secret confidentiality agreements "when a [DMCA] subpoena is issued for subscriber information to identify potential defendants": (1) *Strike 3 Holdings, LLC v. Doe*, No. 18-CV-02019-YGR-EDL, 2018 WL 10604533 at *3 (N.D. Cal. Sept. 14, 2018) ("*Strike 3 Holdings #1*"); (2) *Strike 3 Holdings, LLC v. Doe*, No. 4:22-CV-879-SDJ, 2023 WL 4922590 at *3 (E.D. Tex. Aug. 1, 2023) ("*Strike 3 Holdings #2*"); (3) *Strike 3 Holdings, LLC v. John Doe Subscriber Assigned IP Address 76.103.185.1*, No. 19-CV-00232-EMC, 2019 WL 591460, at *3 (N.D. Cal. Feb. 13, 2019) ("*Strike 3 Holdings #3*"); (4) *Strike 3 Holdings, LLC v. Doe*, 740 F. Supp. 3d 121 (D. Conn. 2024) ("*Strike 3 Holdings #4*"); (5) *Hard Drive Prods. v. Does 1-48*, No. 11 CV 9062, 2012 WL 2196038, at *6 (N.D. Ill. June 14, 2012) ("*Hard Drive*"); (6) *After II Movie, LLC v. Grande Commc'ns Networks LLC*, No. 1:21-CV-00709-RP, 2023 WL 3094122, at *2 (W.D. Tex. Apr. 26, 2023) ("*After II Movie*"). These cases are inapposite and thus, as discussed below, TTI has not proven that good cause exists to enter a protective order on the grounds asserted. Gharavi Decl., Ex. B, ¶ 13.

First, all but one of the six cases (*After II Movie*) involves content of a sensitive and stigmatizing nature. Arguably, the *Hard Drive* court offers the most eloquent analysis of what distinguishes these cases from the instant one:

> *... this court understands why Hard Drive's strategy in this litigation and other cases like it causes some defendants a particular level of chagrin. It is one thing to be accused of pirating a copy of, say, an album by Bob Dylan; for many people it is quite another to be publicly named as having downloaded a video titled 'Amateur Allure—Dylan.' According to the movant, Hard Drive's law firm has created a niche practice in exploiting this distinction, trusting that once identified, some critical mass of defendants will agree to pay a settlement in exchange for never being publicly associated with pornography in court documents— whether or not they are actually guilty of pirating the relevant video.*

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

> *This court noted in another case that the same lawyers representing Hard Drive here have filed at least 118 of these lawsuits against more than 15,000 Does since 2010. See Pacific Century, 2012 WL 1072312 at \*2. And other courts have described the litigation tactic of adult film producers as the movant does here: the plaintiff sues a mass of anonymous defendants, gains leave to take expedited discovery to obtain the identities of the IP subscribers, then settles with numerous defendants who are motivated to avoid being publicly connected to pornographic movies, although the plaintiff actually harbors little interest in going through with litigating the matter.*

*Id.*, at \*5. TTI has not even attempted to assert that the content at issue in the present matter is sensitive or stigmatizing, and thus effectively waives this argument.

Second, all six cases involve mass litigants. For example, "Over the last two years, Plaintiff has filed dozens of copyright infringement cases in this District [alone], all of which are initiated with virtually identical complaints." *Strike 3 Holdings #1*, at \*1. "Defendant cites several cases that have expressed concerns about the potentially coercive nature of copyright infringement cases involving pornography, particularly where the plaintiff tries to use the mass joinder of defendants as a tool for leveraging settlements." *Id.*, at \*3.

In fact, these cases are so prolific that they have given rise to an entire legal defense industry targeting their defendants. Gharavi Decl., Ex. B, Ex. 6; *see also* YouTube, https://www.youtube.com/watch?v=1uV8JyTBCQs (last visited Apr. 5, 2025). In contrast to these cases, the instant case is brought by a *pro se* litigant without the institutional capacity for mass harassment or the resources to exploit BSI for improper purposes. The reason these courts imposed protective orders was to curb abuse by high-volume litigants, not *pro se* parties. Courts grant them only when specific, concrete harms are shown.

Third, in several cases, plaintiffs did not even oppose a protective order. For example, "... any threat to the subscriber's privacy is necessarily reduced because ...

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

Plaintiff has unambiguously stated that it is willing to enter into a protective order ..." *Strike 3 Holdings #1*, at *3.

Note that TTI's case law citation to "Strike 3 Holdings, LLC v. John Doe, No. 18-cv-02019, 2019 WL 591460 (N.D. Cal. Feb. 13, 2019)" erroneously conjoins two different cases. The first half of TTI's citation refers to a September 14, 2018 case ("*Strike 3 Holdings #1*" above), while the second half refers to a February 13, 2019 case. Since there was no *sua sponte* action in the 2018 case, TTI appears to be citing *Strike 3 Holdings, LLC v. John Doe Subscriber Assigned IP Address 76.103.185.1*, No. 19-CV-00232-EMC, 2019 WL 591460 (N.D. Cal. Feb. 13, 2019) ("*Strike 3 Holdings #3*" above). Significantly, TTI omits that, "Several considerations in this case counsel in favor of a protective order to preserve Defendant's privacy, and Plaintiff does not oppose such an order." Id. at *3. This is a critical factor distinguishing that case from the present matter.

Plaintiff has clearly asserted that TTI's trade secret confidentiality agreement is unduly burdensome and mooted by the protections already afforded under 17 U.S.C. § 512(h)(2)(C), as noted in *Baugher v. GoDaddy.com LLC*, No. MC-19-00034-PHX-JJT, 2021 WL 4942658, at *5 (D. Ariz. Oct. 22, 2021). Moreover, the *Hard Drive* court did not even enter a protective order in the cited opinion—it merely opined that, due to the sensitive and stigmatizing nature of adult content, "the circumstances here might be particularly appropriate for the issuance of a protective order allowing any information released by the ISPs to be treated as confidential *for a limited duration*." (emphasis added) In fact, its recommendation was for the parties to simply consider one that treats the information as confidential for a "limited duration" (*i.e.*, user notification period), which stands in stark contrast to the burdensome restrictions found within TTI's proposed trade secret confidentiality agreement.

Fourth, all six cases involve heavily regulated Section 512(a) nonparty ISPs such as Comcast. TTI "does not qualify as a 'service provider' as that term is used in

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

Section 512(a)." *Rosen v. Glob. Net Access, LLC*, No. CV 10-2721-DMG E, 2014 WL 2803752, at *4 (C.D. Cal. June 20, 2014) ("*Rosen*"). Unlike Section 512(a) ISPs, "... the Cable Communications Privacy Act of 1984, 47 U.S.C. § 551(c) prohibits ISPs from disclosing a subscriber's personally identifying information to a private party absent the subscriber's consent or a court order ..." *Strike 3 Holdings #4*, at *125. Recognizing this higher level of protection, the Second Circuit—where this case took place—has adopted a higher standard of protection, particularly where adult content is implicated.

> *A court that grants a motion to serve a third-party subpoena on a qualifying service provider prior to a Rule 26(f) conference generally must issue a protective order requiring the ISP to comply with cable operator disclosure laws and order the ISP to issue a notice informing the subscriber of the court's order and providing the subscriber an opportunity to contest the subpoena.*

*Id.* Aside from the obvious distinction that case law from the Second Circuit is nonbinding here, TTI is not a "qualifying service provider" and therefore would not be afforded this higher level of protection even if this case were litigated in that circuit.  Moreover, TTI is a Section 512(c) social media company that requires authentication through username, password, and two-factor verification, which virtually eliminates the possibility of misidentification that concerned courts in the cited cases. Gharavi Decl., Ex. B, ¶¶ 15-17. This is materially distinguishable from ISPs, which rely on Internet Protocol (IP) addresses that could be accessible by individuals other than the subscriber (e.g. via an unprotected Wi-Fi hotspot).

Fifth, where protective orders were actually entered, all but one (*After II Movie*) involved protective orders that fit within less than a page of text (as opposed to TTI's 14 pages). Moreover, where the restrictions lasted beyond a limited duration user notification period, it was due to factors one and two above, implicating past abuse from mass litigants and content of a sensitive and stigmatizing nature. *After II Movie* is the only case where a 22-page trade secret confidentiality agreement rivals

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

TTI's. As the motion for the protective order in that case was put forth by the plaintiff, it stands to reason that the plaintiff was unopposed, which is distinguishable from the instant matter as addressed in factor three above. Moreover, their choice to use a 22-page document is particularly befuddling considering the matter pertains to infringement of motion pictures, and yet the document contains multiple irrelevant sections addressing "HIGHLY CONFIDENTIAL – SOURCE CODE Information".

Notably, the cited opinion includes no analysis or reasoning as to the basis for this. In any case, a district court case from the Western District of Texas is merely persuasive authority. "[A] decision of a federal district judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Dowd v. City of Los Angeles*, 28 F. Supp. 3d 1019, 1066 (C.D. Cal. 2014) (citing *Camreta v. Greene*, ——U.S. ——, 131 S.Ct. 2020, 2033 n. 7, 179 L.Ed.2d 1118 (2011)). *See also Allstate Ins. Co. v. Stevens*, 445 F.2d 845, 846 (9th Cir. 1971); *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1075 (C.D. Cal. 2009), aff'd, 404 F. App'x 496 (Fed. Cir. 2010).

Unlike the cases TTI cites, which involved anonymous defendants identified only by IP addresses, the instant subpoena seeks BSI for 22 named TikTok accounts. This fundamental difference reduces the risk of "fishing expeditions" or targeting innocent third parties, which underpinned the privacy concerns in TTI's cited precedents.

TTI's reliance on *Mintz v. Mark Bartelstein & Assocs., Inc*. is similarly misplaced. In *Mintz*, the court granted a protective order because the subscriber information at issue included Call Detail Records (CDR) such as telephone numbers called, cell site information (i.e., geolocation), and call duration—information the court deemed private enough to warrant *in-camera* review. *Mintz v. Mark Bartelstein & Assocs., Inc.*, 885 F. Supp. 2d 987, 999 (C.D. Cal. 2012). The *Mintz* court's decision was also influenced by the fact that "Plaintiff paid for part of the cost of the Blackberry," which "increases his expectation of privacy because he could

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

1  reasonably believe that he owned the phone." Id. at 997-98. By contrast, the instant

2  matter involves free social media accounts, where users have no expectation of

3  privacy in BSI for the purposes of identifying alleged infringers in a copyright case.

4  Gharavi Decl., Ex. B, ¶¶ 18-22. TTI's counsel was made aware of these distinctions

5  on February 15, 2025, yet chose not to address them in TTI's portion of the joint

6  stipulation. Gharavi Decl., Ex. B, ¶ 22.

## B.     TTI's Motion Seeks an Improper Advisory Opinion

8  Make no mistake: despite TTI's attempt to frame this as a controversy to

9  "protect the information of potentially innocent third parties," there is no genuine

10 controversy here. The reality is that TTI is concerned about its own liability in the

11 event that a user whose information was disclosed attempts to file a lawsuit against

12 TTI for the disclosure. At first blush, this may sound like a conclusory assertion, but

13 TTI openly admitted as such, stating "TikTok needs a confidentiality order to *protect*

14 *itself* in producing the confidential data." (emphasis added) Gharavi Decl., Ex. B, ¶

15 7, Ex. 2.

16 TTI is not actually concerned with whether it wins or loses this motion for a

17 protective order because *TTI wins either way*. If the court grants TTI's motion, TTI

18 can point to its leviathan confidentiality agreement as an affirmative defense. If the

19 court denies TTI's motion, TTI can point to the court's order as an affirmative

20 defense. That is why its motion was hastily drafted with conclusory arguments,

21 fraught with false, misleading and erroneous statements, and sourced primarily with

22 inapposite case law: TTI doesn't need to win, in order to win.

23 Put another way, TTI is seeking an advisory opinion to shield itself from

24 liability. TTI is not alone in this practice, as another leading social media platform

25 similarly maintains a blanket policy seeking advisory opinions in order to shield itself

26 from liability. "In response to the Subpoena, X refused to produce the requested

27 information, informing Agdal's counsel, stating that 'as a matter of course' it requires

28 parties seeking identifying information for X accounts to obtain a court order, thus

Faegre Drinker Biddle &
Reath LLP
Attorneys at Law
Los Angeles

15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

necessitating the instant Motion." *Agdal v. X Corp. In Int. to Twitter, Inc.*, No. 24-MC-80266-JCS, 2025 WL 81594, at *2 (N.D. Cal. Jan. 13, 2025). Although the blanket policy in that case centered on First Amendment review, the foundational concept of seeking advisory opinions for protection from liability is the same.

That court rejected X's policy just as this court should reject TTI's policy as well.

> *As a preliminary matter, the Court rejects X's assertion that it is proper to refuse to comply with a lawfully issued subpoena and to insist on a 'First Amendment review' by the Court where it does not have a good faith belief that the requested disclosures will actually violate the First Amendment. X is, in essence, requesting an advisory opinion to shield itself from potential liability. Under Article III of the U.S. Constitution, however, federal courts do not have jurisdiction to issue advisory opinions.*

*Agdal*, 2025 WL 81594, at *3 (quoting *Carney v. Adams*, 592 U.S. 53, 58, 141 S.Ct. 493, 208 L.Ed.2d 305 (2020) ("The Constitution grants Article III courts the power to decide 'Cases' or 'Controversies.' Art. III, § 2. We have long understood that constitutional phrase to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions.")).

The DMCA subpoena mechanism was specifically designed by Congress to allow copyright holders to identify alleged infringers without filing a lawsuit. Gharavi Decl., Ex. B, ¶ 24. By imposing additional requirements beyond those specified in the statute, TTI is effectively asking this Court to rewrite the law.

However, despite the fact that it is win-win for TTI, it is lose-lose for small, independent creators such as Plaintiff who must cease production on revenue generating operations for days at a time not only to pursue copyright infringers through DMCA takedown notices, but also to perform extensive legal research using limited, shared county law library resources to seek compliance with a valid and

enforceable subpoena to obtain information sufficient to identify infringers from TTI. Gharavi Decl., Ex. B, ¶¶ 29-31. Counsel for TTI is paid either way, but Plaintiff on the other hand loses money every day spent researching and drafting unnecessary motions just to enforce basic copyrights.

## C.   TTI Mischaracterizes User Notification Procedures

TTI's position that individuals subject to this subpoena are "unknown" with "no ability to object" directly contradicts their own "TikTok Law Enforcement Guidelines," which explicitly state: "It is our policy to notify TikTok users before disclosing their data..." Gharavi Decl., Ex. B, ¶ 23, Ex. 4; *see also* Law Enforcement Guidelines, TikTok (May 11, 2023), https://www.tiktok.com/legal/page/global/law-enforcement/en (last visited April 3, 2025). Although these guidelines appear primarily directed at law enforcement requests, it would be implausible for TTI to offer users less protection against civil subpoenas than law enforcement subpoenas.

TTI's obligation is straightforward: notify users of the subpoena, allow them a reasonable period to file a motion to quash, and then produce the BSI if users have not done so after the notification period expires. Gharavi Decl., Ex. B, ¶ 27. Given that TTI acknowledged receipt of the subpoena on January 30, 2025, any reasonable notification period would have long expired by now.

This notification process gives users the opportunity to assert their own privacy interests and file motions to quash if they wish to proceed anonymously. The Court does not need to preemptively decide these issues through a protective order when TTI's established notification procedures already provide users with the means to protect their own interests. If, after being notified by TTI, users choose not to assert objections or request anonymity, there is no basis for TTI to do so on their behalf. TTI's argument for a protective order to protect "currently unknown interests" is therefore redundant given its own notification procedures and serves only to unnecessarily delay compliance with a valid DMCA subpoena.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

### D.     <u>The DMCA Already Provides Adequate Safeguards</u>

TTI's assertion that denying its motion would give Plaintiff "unbridled ability to publish this information without restraint" mischaracterizes the DMCA's built-in protections and prior communications from Plaintiff informing TTI of the same. The sworn declaration required under 17 U.S.C. § 512(h)(2)(C) already restricts the use of information obtained through the subpoena to protecting copyright rights. Gharavi Decl., Ex. B, ¶ 28. TTI was made aware of this statutory protection on our February 11, 2025 phone call, and acknowledged it on February 14, 2025. Gharavi Decl., Ex. B, Ex. 2.

TTI's claim that Plaintiff believes the information "should not be subject to any disclosure restrictions" misrepresents Plaintiff's position. Plaintiff has consistently maintained that the information is already subject to the restrictions imposed by the sworn declaration required under 17 U.S.C. § 512(h)(2)(C). Gharavi Decl., Ex. B, ¶ 28.

This statutory requirement serves the same purpose as a protective order—it limits the use of the information obtained through the subpoena to protecting copyright rights. By seeking an additional protective order, TTI is essentially asking for duplicative protections that serve no legitimate purpose other than to delay compliance with the subpoena.

### E.     <u>No Expectation of Privacy in BSI</u>

Courts in this district have rejected similar arguments about protecting users from "unnecessary annoyance, embarrassment, or oppression." In *Smythe v. Does 1-10*, the court held that "concerns regarding undue embarrassment or humiliation are unpersuasive" when ordering production of BSI without a protective order. *Smythe v. Does 1-10*, No. CV 15-4801-R, 2015 WL 12819173, at *2 (C.D. Cal. Sept. 25, 2015) (ordering production of BSI without a protective order despite concerns of undue embarrassment or humiliation) *Smythe v. Does 1-10*, No. CV 15-4801-R,

1    (C.D. Cal. Aug. 18, 2015) (same) See also *Smythe v. Does 1-10*, No. CV 15-4801-R,

2    (C.D. Cal. Nov. 9, 2015) (ordering production of BSI without a protective order).

3         The Ninth Circuit has consistently held that users have no reasonable

4    expectation of privacy in their BSI. For instance, in *United States v. Rosenow*, the

5    court stated that unlike cell-site location data, which implicates a defendant's

6    reasonable expectation of privacy in their physical location and movements, "... a

7    defendant 'ha[s] no expectation of privacy in ... IP addresses' or basic subscriber

8    information because internet users 'should know that this information is provided to

9    and used by Internet service providers for the specific purpose of directing the routing

10   of information.' " *United States v. Rosenow*, 50 F.4th 715, 737–38 (9th Cir. 2022)

11   (quoting *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008)). Furthermore,

12   the court held that Rosenow "had no reasonable expectation of privacy in the

13   subscriber information and the IP log-in information [he] voluntarily provided to

14   [Facebook] in order to establish and maintain his account." *Id.* at 728 (alterations in

15   original).

16        It is implausible for TTI argue that it was unaware of this since several of the

17   cases they cited include similar language.

18        *"Courts have held that "[i]nternet subscribers do not have an*
      *expectation of privacy in their subscriber information as they already*
19    *have conveyed such information to their Internet Service Providers."*
      *West Bay One, Inc. v. Does 1–1,653, 270 F.R.D 13, 15 (D.D.C. 2010)*
20    *(citing, among others, Guest v. Leis, 255 F.3d 325, 335–36 (6th Cir.*
      *2001) ("Individuals generally lose a reasonable expectation of privacy*
21    *in their information once they reveal it to third parties."))."*

22

23

24        *Strike 3 Holdings #2*, at *3. *See also Strike 3 Holdings #4*, at 126; *Hard Drive*,

25   at *4. TTI's awareness of this legal precedent underscores that its request for a

26   protective order is not grounded in legitimate privacy concerns but rather in its own

27   interests. Given the established lack of privacy expectation in BSI, TTI's motion for

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

a protective order is unnecessary and serves only to delay compliance with the DMCA subpoena.

### F.    Filing Under Seal Is Unduly Burdensome

Filing under seal is extremely cumbersome for a *pro se* litigant. It requires (1) an application to file under seal, (2) a declaration in support of the application, (3) a proposed order, (4) a redacted version of the document to be filed, (5) an unredacted version of the document to be filed, and (6) a proof of service. Gharavi Decl., Ex. B, ¶ 29. This process must be repeated for each filing that contains any information subject to the protective order. For a *pro se* litigant without legal training, this process is unnecessarily burdensome and serves only to discourage the enforcement of legitimate copyright claims. Gharavi Decl., Ex. B, ¶ 30.

When asked about filing under seal pursuant to TTI's proposed trade secret confidentiality agreement, counsel for TTI indicated that he has never been informed that someone had filed an actual BSI document with a court. Plaintiff has successfully done so in multiple cases. For example, in *Gharavi v. Tumblr, Inc.*, Case No. 1:24-cv-12718 (N.D. Ill. 2024) and *In re DMCA Subpoena to Reddit, Inc.*, Case No. 4:25-mc-80002-DMR (N.D. Cal. 2025), the courts ruled on the merits of the motions without any suggestion that filing BSI productions with the court was improper. Gharavi Decl., Ex. B, ¶¶ 33-35.

Moreover, TTI's proposed protective order would apply not only to the information obtained through the subpoena but also to any documents that reference that information. This would effectively require Plaintiff to file under seal any complaint that identifies the alleged infringers, even though the identity of parties to a lawsuit is generally public information. Gharavi Decl., Ex. B, ¶ 31.

TTI's position regarding the confidentiality of IP addresses is inconsistent with its own citations. In its motion, TTI cites to several cases whose full titles include the very information TTI claims requires protection. For example, TTI cites to *Strike 3 Holdings, LLC v. John DOE Subscriber Assigned IP Address 67.170.214.219* and

20

*Strike 3 Holdings, LLC v. John Doe Subscriber Assigned IP Address 76.103.185.1*, among others. Gharavi Decl., Ex. B, Ex. 8 at 6. Although not reflected in TTI's motion, each of these cases publicly discloses defendants' IP addresses in their titles, which contradicts TTI's argument that such information requires special protection.

This inconsistency raises questions about TTI's citation practices. Westlaw's citation feature does not always include IP addresses in case titles; however, in the case of "*Strike 3 Holdings, LLC v. John Doe Subscriber Assigned IP Address 76.103.185.1*" (*Strike 3 Holdings #3*), manual manipulation would have been required to override and delete the IP address when pasting the citation using Westlaw's default settings. Gharavi Decl., Ex. B, Ex. 8 at 6. It is likewise notable that TTI's only citation to "Strike 3 Holdings, LLC, 740 F. Supp. 3d at 127" omits not only the defendant's IP address but also fails to indicate that the case is from the District of Connecticut, outside this circuit. Gharavi Decl., Ex. B, Ex. 8 at 7.

These inconsistencies undermine TTI's position that IP addresses and subscriber information require the extraordinary protection of a 14-page confidentiality agreement and sealed filings.

## G.    Precedent Favors Enforcement Without Protective Orders

In direct contrast to TTI, which failed to cite a single case involving a DMCA subpoena, Plaintiff has found numerous cases in which courts have enforced DMCA subpoenas without imposing protective orders. Gharavi Decl., Ex. B, ¶ 32.

For example, in *In re DMCA Subpoena to eBay, Inc.*, the court held a DMCA subpoena valid and enforceable for production of "the name, last known address, last known telephone number, any electronic mail addresses associated with each account from January 1, 2012, to the date of the subpoena and any logs of Internet Protocol addresses used to access the subject accounts" during the same period without imposing a protective order. *In re DMCA Subpoena to eBay, Inc.*, No. 15-CV-922-BEN-MDD, 2015 WL 3555270, at *4 (S.D. Cal. June 5, 2015).

Similarly, in *Cognosphere Pte. Ltd. v. X Corp.*, the court denied X Corp.'s motion to quash a DMCA subpoena seeking identifying information of alleged copyright infringers and ordered compliance without imposing a protective order. *Cognosphere Pte. Ltd. v. X Corp.*, No. 23-mc-80294-PHK, 2024 WL 4227594, at *9 (N.D. Cal. Sept. 18, 2024).

Despite TTI counsel's assertion during our conferrals that "a protective order is common for BSI productions," TTI has not produced a single persuasive or binding authority in which a protective order was granted by a court in response to a DMCA subpoena over a plaintiff's objection.

The court in *Baugher v. GoDaddy.com LLC* explicitly addressed the very concern TTI raises here. The court stated: "The Does' fears that that disclosure of their identities will be misused is addressed both by the DMCA itself, which states the identities will only be used for the limited purpose of protecting the applicant's copyright, 17 U.S.C. § 512(h)(2)(C), and Baugher's attestation to the same." *Baugher*, at *5 (denying motion to quash DMCA subpoena seeking identifying information of anonymous bloggers who posted copyrighted materials and ordering GoDaddy to comply without imposing a protective order).

These cases demonstrate that courts routinely enforce DMCA subpoenas without imposing the kind of burdensome protective order that TTI seeks here. The absence of protective orders in these cases underscores the fact that such orders are not necessary to protect legitimate privacy interests in the context of DMCA subpoenas. Gharavi Decl., Ex. B, ¶¶ 33-35.

### H.    TTI's Dilatory Tactics

TTI's motion for a protective order appears to be part of a broader pattern of dilatory tactics designed to frustrate copyright enforcement. TTI has repeatedly sought extensions and imposed additional requirements beyond those specified in the DMCA, all while failing to comply with a valid subpoena that was served over two months ago. Gharavi Decl., Ex. B, ¶ 36.

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

22

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

This is not merely a conclusory allegation. At great cost to revenue generation activities, Plaintiff spent several days organizing data and running statistical analyses to create a scorecard comparing TTI to its peers. Gharavi Decl., Ex. B, ¶ 37. When it comes to meeting the requirements of 17 U.S.C. § 512(c)(1)(A)(i)-(iii) for "expeditiously" disabling infringing content in response to valid 17 U.S.C. § 512(c)(3) takedown notices, the majority of the cohort—Facebook, YouTube, Instagram and X Corp—average a response time of less than a day (between 0 to 13 hours). The next two do not fall far behind, with Tumblr and Reddit averaging two days to respond.[1] With an average response time of 30 days, TTI's performance significantly deviates from industry standards and falls well outside of reasonable expectations for "expeditious" action under the statute. Gharavi Decl., Ex. B, ¶ 38, Ex. 7 at 1.

| DMCA Takedown Notice Response Time (2024 Q4 & 2025 Q1) | | | | | |
|---|---|---|---|---|---|
| Service Provider | DMCA Notices | Infringing Works | Average Response (Days) | Avg. Response (Hours) | Avg. Response (Mins) |
| TikTok | 8 | 653 | 30 | 725 | 43,474 |
| Reddit | 5 | 20 | 2[1] | 50 | 3,011 |
| Tumblr | 2 | 23 | 2 | 41 | 2,476 |
| X Corp | 14 | 69 | 1 | 13 | 793 |
| Instagram | 9 | 25 | 0 | 6 | 349 |
| YouTube | 12 | 19 | 0 | 1 | 80 |
| Facebook | 2 | 8 | 0 | 0 | 25 |

[1]Reddit has one statistical outlier of 22.9 days that was excluded in keeping with standard statistical analysis practices. If included, it would increase Reddit's average to 6 days.

Figure 1 (Gharavi Decl., Ex. B, ¶ 38, Ex. 7 at 1.)

"The safe harbor provided by Section 512(c) cannot apply where the service provider both possesses actual or objective knowledge and fails to expeditiously remove infringing material upon such knowledge." *Rosen*, at *5.

---

[1] Reddit has one statistical outlier of 22.9 days that was excluded in keeping with standard statistical analysis practices. If included, it would increase Reddit's average to 6 days.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

TTI might argue that this is not their fault—that there is a much greater volume of infringement on their platform, and therefore requires more time to respond. Even if, *arguendo*, this were true, a 30-day average per report is inexcusable.

Temporarily excluding TTI as an outlier from the rest of its cohort, with a data set of 0, 0, 0, 1, 2, 2, the mean is 0.833 days and the standard deviation is 0.898 days. At 30 days, that means TTI's average response time is 32.497 standard deviations away from the mean. This statistical anomaly demonstrates that TTI's response time is objectively unreasonable by any industry standard. Gharavi Decl., Ex. B, ¶ 39.

Moreover, this hypothetical argument is belied by the fact that TTI's response times do not vary materially regardless of the quantity of videos in each report. Even reports containing only two, four, or six allegedly infringed works resulted in response times of 25, 27, and 30 days respectively. Gharavi Decl., Ex. B, ¶ 40, Ex. 7 at 2.

Rather, TTI's greater volume of infringement appears to result from its approach to repeat infringer policy, which may not align with 17 U.S.C. § 512(i)(1)(A).

> *A party asserting an affirmative defense under any of the DMCA safe harbors must first meet the requirements of Section 512(i), which, in part, requires service providers to have 'adopted and reasonably implemented ... a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or the network who are repeat infringers[.]*

*Rosen*, at *4. TTI has failed to disable access to many of the accounts engaged in prolific infringement, despite receiving valid DMCA takedown notices. Gharavi Decl., Ex. B, ¶ 41. For example, Plaintiff submitted valid takedown notices identifying 48 allegedly infringing videos from one user, 31 from another, and 24 from a third. Despite these substantial numbers of alleged infringements, these accounts remained active as of April 3, 2025. Gharavi Decl., Ex. B, ¶ 41.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION
REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

> *Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual knowledge or awareness of facts or circumstances from which infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.*

*Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM SHX, 2010 WL 9479059, at *10 (C.D. Cal. July 26, 2010) (emphasis in original) ("Perfect 10").

This Court held in *Rosen* that the defendant failed to act expeditiously in its removal of infringing material after "some two months later." *Rosen*, at *5. Because, as noted in *Perfect 10*, "the factual circumstances and technical parameters may vary from case to case," it is reasonable to conclude that TTI has likewise failed to act expeditiously in light of data showing its response times were an order of magnitude longer than industry standards, particularly when contrasted with its peers.

## I.    TTI's Financial Interest in Infringing Content

TTI's reluctance to comply with DMCA subpoenas and its failure to expeditiously disable access to infringing content may be explained by its financial interest in the infringing activity. As established in the Legal Standard section, TTI fails all three requirements for safe harbor protection under *Io Group*.

"TikTok made 77% of its revenue from advertising, with the rest coming from commerce and in-app purchases."[2] Aside from the obvious inference as to why TTI would choose to be lax in terminating repeat infringers (*i.e.*, loss of users and their respective content would result in fewer advertisement impressions), it is worth noting that the conduct of one of the aforementioned repeat infringers is particularly egregious, in that they exclusively publish video content infringing on Plaintiff's

---

[2] TikTok Revenue and Usage Statistics, Mansoor Iqbal (February 25, 2025), https://www.businessofapps.com/data/tik-tok-statistics/ (last visited April 3, 2025).

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

copyright(s) behind TTI's subscription paywall, making them available only to those willing to pay a monthly fee. According to TTI's own website, "After app store fees, TikTok splits the revenue up to 50/50 with you." Gharavi Decl., Ex. B, ¶ 43; *see also* https://www.tiktok.com/creator-academy/article/Subscription (last visited April 4, 2025). This means TTI directly profits from subscription fees paid to access infringing content.

Plaintiff has personally paid for a subscription to access this infringing content on TTI's platform. Gharavi Decl., Ex. B, ¶ 42, Ex. 9. This subscription fee is a direct financial benefit to TTI that is attributable to the infringing activity.

> *[A] service provider is eligible for safe harbor under section 512(c) if it (1) does not know of infringement; or (2) acts expeditiously to remove or disable access to the material when it (a) has actual knowledge, (b) is aware of facts or circumstances from which infringing activity is apparent, or (c) has received DMCA-compliant notice; and (3) either does not have the right and ability to control the infringing activity, or—if it does—that it does not receive a financial benefit directly attributable to the infringing activity.*

*Io Group*, at 1146.

TTI fails on all three counts. It (1) knows of ongoing infringement from repeat infringers, (2) it fails to act expeditiously to remove or disable access to the material when (c) it receives DMCA-compliant notices, and (3) it has the right and ability to control the infringing activity and it receives a financial benefit directly attributable to the infringing activity.

TTI's failure to expeditiously disable access to infringing content and its attempts to delay compliance with DMCA subpoenas suggest that it values the revenue generated by infringing content more than it fears the potential liability for copyright infringement. This calculation is only possible because TTI believes it can hide behind the DMCA's safe harbor provisions while simultaneously failing to meet the requirements for those protections.

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

26

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

## V.    **CONCLUSION**

For the foregoing reasons, TTI's motion for a protective order should be denied, and TTI should be ordered to comply with the DMCA subpoena forthwith. Based on the arguments presented and the applicable law, I respectfully request that this Court:

1. Deny TTI's motion for a protective order;

2. Order TTI to comply with the subpoena within 15 days, providing "For each of the subsequently listed user account(s): the name, last known address, last known telephone number, any electronic mail addresses associated with each account from three (3) years to the date of the subpoena and any logs of Internet Protocol addresses used to access the subject account(s) from three (3) years to the date of the subpoena." See *In re DMCA Subpoena to eBay, Inc.*, 2015 WL 3555270, at *4;

3. Require the parties to file a joint status report regarding compliance within fourteen days thereafter, informing the Court whether any disputes remain related to TTI's compliance with the Subpoena. See *Agdal v. X Corp.*, 2025 WL 81594, at *7;

4. Declare that TTI's blanket policy of requiring protective orders for all basic subscriber information productions regardless of good cause under Fed. R. Civ. P. 26(c)(1) is improper and inconsistent with the DMCA's statutory framework;

5. Declare that TTI's demonstrated pattern of delayed responses to DMCA takedown notices (averaging 30 days) - which is 32.497 standard deviations from the industry mean of 0.833 days - categorically fails to meet the "expeditious" standard required by 17 U.S.C. § 512(c)(1)(A)(iii), thereby invalidating its safe harbor protections under the DMCA;

The evidence presented demonstrates that TTI has engaged in a pattern of dilatory tactics that frustrate the purpose of the DMCA's expedited enforcement

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

27

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

mechanisms. TTI's insistence on an unnecessary and burdensome protective order appears designed primarily to shield itself from liability rather than to protect legitimate privacy interests—interests that are already adequately protected by the sworn declaration required under 17 U.S.C. § 512(h)(2)(C).

As a *pro se* litigant and small content creator, Plaintiff has already suffered significant delays and incurred substantial opportunity costs in pursuing this matter. The Court's intervention is necessary not only to resolve the immediate dispute but also to prevent TTI from continuing to impose undue burdens on copyright holders through policies that lack legal justification and undermine the statutory framework established by Congress.

Dated:        April 14, 2025            FAEGRE DRINKER BIDDLE & REATH LLP

By:  /s/ Nicholas J. Begakis
     ─────────────────────────
     Nicholas J. Begakis

Attorneys for Third-Party Subpoena Respondent
TIKTOK INC.

Dated:        April 14, 2025

By:  /s/ Nima Gharavi
     ─────────────────────────
     Nima Gharavi

*Pro se*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

# EXHIBIT A

1    NICHOLAS J. BEGAKIS (SBN 253588)
     nicholas.begakis@faegredrinker.com
2    FAEGRE DRINKER BIDDLE & REATH LLP
     1800 Century Park East, Suite 1500
3    Los Angeles, California 90067
     Telephone:+1 310 203 4000
4    Facsimile: +1 310 229 1285

5    Attorneys for Third-Party Subpoena Respondent
     TIKTOK INC.

6

7    NIMA GHARAVI
     nima@midwestwrestle.com
8    4610 North Clark Street, St. 1098
     Chicago, Illinois 60640

9    Plaintiff *Pro Se*

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

| 13 | NIMA GHARAVI, | Case No. Civil Action No. 2:25-mc-00002-UA |
|---|---|---|
| 14 | Plaintiffs, | **DECLARATION OF NICHOLAS J. BEGAKIS IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER** |
| 15 | v. | |
| 16 | TIKTOK INC., TIKTOK LTD., TIKTOK PTE. LTD., and TIKTOK U.S. DATA SECURITY INC., | |
| 17 | | |
| 18 | Third-Party Subpoena Respondents. | Date: May 23, 2025 Time: 9:30 a.m. |
| 19 | | Hon.: Judge Dolly M. Gee Discovery Cut-Off: N/A |
| 20 | | Pretrial Conference: N/A Trial Date: N/A |
| 21 | | |

22          I, Nicholas J. Begakis, hereby declare as follows:

23          1.    I am duly licensed to practice law before this Court and am an attorney

24    with the law firm of Faegre Drinker Biddle & Reath LLP, counsel for TikTok, Inc.

25    ("TTI") in the above action. I make this Declaration in support of the Joint Stipulation

26    Regarding TTI's Request for Entry of a Protective Order. I have personal knowledge

27    of the facts contained herein and, if called as a witness, I could and would

28    competently testify to those facts.

DECLARATION OF NICHOLAS J. BEGAKIS IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

2.     Plaintiff served a subpoena under Federal Rule of Civil Procedure 45 and 17 U.S.C. § 512(h) to TTI, TikTok Pte. Ltd, and TikTok U.S. Data Security Inc. ("Subpoena").

3.     My colleague, Bryan Pasciak, informed Plaintiff that TTI was the correct entity for service, and the Parties agreed the other entities that received the subpoena would have no obligation to provide a further response.

4.     TTI's counsel has on multiple occasions conferred with the pro se Plaintiff about the Subpoena's scope, including a Local Rule 37-1 prefiling telephonic conference of counsel on April 10, 2025, where I personally conferred with Plaintiff.

5.     TTI and Plaintiff agreed the Subpoena's scope would be limited to the production of Basic Subscriber Information ("BSI") for the identified accounts.

6.     During the conferrals, including the Rule 37-1 telephonic conference, we asserted TTI would produce the BSI subject to a protective order and was willing to confer regarding any edits Plaintiff believed were necessary to pursue his claims. Pro se Plaintiff, however, consistently stated he will not agree to entry of any protective order.

7.     TTI's counsel has explained much of the information and arguments contained in this Stipulation, including that a protective order is common for BSI productions, especially when the account owners are unknown and unable to assert their objections.

8.     Plaintiff took the position that he will need to use this information to identify and pursue claims against the account owners and, therefore, it should not be subject to any disclosure restrictions.

9.     Attached as **Exhibit A** is a true and correct copy of the stipulated protective order TTI seeks to have entered prior to producing the requested BSI.

DECLARATION OF NICHOLAS J. BEGAKIS IN SUPPORT OF THE JOINT STIPULATION REGARDING
TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on April 11, 2025.

3

4                                             /s/ Nicholas J. Begakis
                                              NICHOLAS J. BEGAKIS

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

DECLARATION OF NICHOLAS J. BEGAKIS IN SUPPORT OF THE JOINT STIPULATION REGARDING
TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER

# Exhibit A Attachment:

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

NIMA GHARAVI               )
                                    )
      Plaintiff,           )
                                      )
      v.                   )      Civil Action No. 2:25-mc-00002-UA
                                      )
TIKTOK INC., TIKTOK LTD.,     )
TIKTOK PTE. LTD., and TIKTOK U.S.  )
DATA SECURITY INC.          )
                                      )
      Third-Party Subpoena Respondents.  )

### <u>STIPULATED CONFIDENTIALITY AND PROTECTIVE ORDER</u>

IT IS HEREBY AGREED by Nima Gharavi and TikTok Inc. ("TTI") that the following protective order ("Order") shall govern disclosures from TTI in the above-captioned case. Accordingly, it is ORDERED:

**1.** **Scope.** Nima Gharavi ("ISSUING PARTY") served a subpoena upon TTI ("Subpoena") requesting documents and/or information, and TTI agreed to produce to the ISSUING PARTY certain documents responsive to the Subpoena subject to the terms and protections set forth in this Order. All documents[1] produced by TTI in response to the Subpoena and information derived directly and/or indirectly therefrom (collectively, "RESPONSIVE DOCUMENT(S)"), shall be subject to this Protective Order concerning confidential information as set forth below. The Order is subject to the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

---

[1] The term "documents" means all documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form, as provided in Federal Rule of Civil Procedure 34.

2.        **Form and Timing of Designation.** Since the RESPONSIVE DOCUMENTS to be produced by TTI may include highly sensitive trade secrets, personally identifiable information ("PII"), or other highly sensitive competitive, proprietary or confidential information, where disclosure to another party could or would result in demonstrable harm to TTI or another person or entity, TTI may designate RESPONSIVE DOCUMENTS as confidential consistent with the terms of this Order. TTI may designate RESPONSIVE DOCUMENTS as confidential and restricted in disclosure under this Order by placing or affixing the words "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" on the RESPONSIVE DOCUMENTS in a manner that will not interfere with the legibility of the RESPONSIVE DOCUMENTS. RESPONSIVE DOCUMENTS shall be designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" prior to or at the time of production or disclosure of a RESPONSIVE DOCUMENT. The designation "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" does not mean that a RESPONSIVE DOCUMENT has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. TTI reserves the right to re-designate and/or add a designation to the documents after producing them.

3.        **RESPONSIVE DOCUMENTS That May Be Designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER."** TTI may designate RESPONSIVE DOCUMENTS as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" upon making a good faith determination that the RESPONSIVE DOCUMENTS contain information protected from disclosure by statute or that should be protected from disclosure as PII, trade secrets, proprietary information, or such other sensitive and confidential information that is not publicly available.

4.        **Depositions.** Portions of deposition testimony shall be deemed "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" if any RESPONSIVE DOCUMENT marked as

"CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" is used as an exhibit during the deposition or the confidential contents of such RESPONSIVE DOCUMENT are discussed during the deposition. Such designations may be made while on the record at the deposition or by promptly notifying the parties and those who were present at the deposition within 30 days after receipt of the final deposition transcript. If the confidential information contained within the RESPONSIVE DOCUMENTS can be redacted so as to cause the RESPONSIVE DOCUMENTS to no longer require the "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" designation, then the RESPONSIVE DOCUMENTS and portions of deposition testimony without confidential information shall not be deemed "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER." If RESPONSIVE DOCUMENTS and/or information from RESPONSIVE DOCUMENTS produced by TTI are used during a deposition, the Party that introduced such evidence must provide TTI written notice of its use and a copy of the final deposition transcript within seven days of receipt. TTI reserves the right to reasonably designate deposition testimony or portions thereof as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" based on a good faith determination that the subject matter refers to confidential TTI information.

     **5.**      **Protection of Confidential Material.**

        **(a)**    **General Protections.** All RESPONSIVE DOCUMENTS produced in response to the Subpoena, including those designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" under this Order, may be used solely for the preparation, trial, and any appeal of claims under the Digital Millennium Copyright Act ("DMCA") related to the accounts subject to Plaintiff's subpoena served on TikTok Inc. in this matter, as well as related settlement negotiations and identification of the alleged infringers consistent with 17 U.S.C. § 512(h)(2)(C), and for no other purpose, without the written consent of TTI. No designated information may be

disclosed to any person except in accordance with the terms of this Order. All persons in possession of designated information agree to exercise reasonable care with regard to the custody, use, or storage of such information to ensure that its confidentiality is maintained. This obligation includes, but is not limited to, providing TTI notice of the receipt of any subpoena that seeks production or disclosure of any designated information within seven (7) days of receipt and consulting with TTI before responding to the subpoena. Any use or disclosure of information in violation of the terms of this Order may subject the disclosing person or party to sanctions.

      **(b)**    **Access to "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" Information.** The parties and counsel for the parties shall not disclose or permit the disclosure of any RESPONSIVE DOCUMENTS, including those designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER", to any third person or entity except as set forth in subparagraphs (1)-(8) below. Subject to these requirements, the following categories of persons may be allowed to review RESPONSIVE DOCUMENTS, including those that have been designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER":

      **(1)**    **Counsel.** Counsel for the parties and employees and agents of counsel who have responsibility for the preparation, trial, and/or appeal of this action;

      **(2)**    **Parties.** Parties and employees of a party to this Order;

      **(3)**    **Court Reporters and Video/Audio Recorders.** Court reporters and any person engaged to record audio and/or video for depositions in this action;

      **(4)**    **Consultants, Investigators, and Experts.** Consultants, investigators, or experts (collectively, "Experts") employed by the

4

parties or counsel for the parties to assist in the preparation and trial of this action, but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound;

**(5)**    **Witnesses and Deponents.** Individuals who are witnesses and/or who are deposed in this action, but only if disclosure is reasonably necessary and to the extent the "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" information was authored by or addressed to the person or such person is established as knowledgeable of the information prior to its disclosure;

**(6)**    **Litigation Vendors.** Vendors  who are hired to assist counsel and/or the parties with the litigation of the above-captioned case, including making photocopies of or organizing RESPONSIVE DOCUMENTS and/or exhibits in this matter, processing electronically stored documents, or other services solely related to this lawsuit;

**(7)**    **The Court and Court Personnel.** The Court, staff, and others employed as personnel of the Court; and

**(8)**    **Others by Consent.** Other persons only by written consent of TTI or upon order of the Court and on such conditions as may be agreed or ordered. All such persons shall execute the certificate contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound.

5

(c)      **Control of RESPONSIVE DOCUMENTS.** Counsel for the parties shall take reasonable and appropriate measures to prevent unauthorized disclosure of RESPONSIVE DOCUMENTS, including but not limited to confidential information contained in documents designated as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" pursuant to the terms of this Order. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of one (1) month after dismissal of the action, settlement, entry of final judgment, and/or the conclusion of any appeals arising therefrom.

(d)      **Duplicate.** Prior to production of a RESPONSIVE DOCUMENT to another party of the litigation or other individual identified above in Section 5(b) ("RECEIVING PARTY"), all copies, electronic images, duplicates, extracts, summaries, or descriptions (collectively, "duplicates")[2] of RESPONSIVE DOCUMENTS designated as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" under this Order, or any individual portion of such a RESPONSIVE DOCUMENT, shall be affixed with the appropriate designation of "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" if the applicable designation does not already appear on the duplicate. All such duplicates shall thereafter be entitled to the protection of this Order. The term "duplicates" shall not include indices, electronic databases, or lists of RESPONSIVE DOCUMENTS, provided these indices, electronic databases, or lists do not contain substantial portions or images of the text of confidential information contained within the RESPONSIVE DOCUMENTS or otherwise disclose the substance of the confidential information contained in those RESPONSIVE DOCUMENTS.

---

[2] The term "duplicate" means "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original," as defined by Federal Rule of Evidence 1001.

6.    **Claw-Back Requests**

(a)    **Failure to Make Designation.** If at any time, TTI discovers that it produced or disclosed protected information without designation, it may promptly notify the RECEIVING PARTY and identify with particularity the information to be designated and the level of designation ("Claw-back notification"). The RECEIVING PARTY may then request substitute production of the newly-designated information. Within 30 days of receiving the Claw-back notification, the RECEIVING PARTY must (1) certify to the designating party it has appropriately marked or, if substitute production has been requested, destroyed all unmarked copies that it received, made, and/or distributed; and (2) if it was practicably unable to mark or destroy any information because disclosures occurred while the RECEIVING PARTY was under no duty of confidentiality under the terms of this Order regarding that information, the RECEIVING PARTY must reasonably provide as much information as practicable to aid the designating party in protecting the information, consistent with the RECEIVING PARTY's attorney-client, work product, and/or trial preparation privileges.

(b)    **Inadvertent Production of Privileged Information.** If at any time, a party discovers it produced or received information that it reasonably believes is subject to protection under the attorney-client, work product, trial preparation or other applicable privileges, then it must promptly notify each other party of the claim for protection, the basis for it, amend its privilege log accordingly, and comply with the Federal Rules of Civil Procedure. Whenever possible, the producing party must produce substitute information that redacts the information subject to the claimed protection. The RECEIVING PARTY must thereupon comply with the applicable Federal Rules of Civil Procedure and its applicable ethical obligations as to the information subject to the claimed protection.

7

7.      **Filing of "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER"**
**RESPONSIVE DOCUMENTS under Seal.** Absent a statute or an order of this Court,
RESPONSIVE DOCUMENTS may not be filed under seal. To the extent a brief, memorandum,
pleading, or any other filings with the Court reference any RESPONSIVE DOCUMENT marked
as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER," then the brief, memorandum,
pleading, or other filing shall refer the Court to the particular exhibit filed under seal without
disclosing the contents of any confidential information. If, however, the confidential information
must be intertwined with the text of the brief, memorandum, pleading, or other filing, a party must
timely move the Court for leave to file a redacted version for the public docket and unredacted
version under seal. Any party that files a document produced by TTI that is marked
"CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" must provide TTI written notice of
its filing on the same day.

Absent a Court-granted exception based upon extraordinary circumstances, any and all
filings made under seal shall reference this Stipulated Protective Order or other relevant
authorizing order. If both redacted and unredacted versions are being submitted for filing, each
version shall be clearly named so there is no confusion as to why there are two entries on the
docket for the same filing.

If a document is not being filed electronically, a sealed filing shall be placed in a sealed
envelope marked "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER." The sealed
envelope shall display the case name and number, a designation as to what the RESPONSIVE
DOCUMENT is, the name of the party on whose behalf it is submitted, and the name of the
attorney who has filed the sealed RESPONSIVE DOCUMENT. A copy of this Stipulated
Protective Order, or other relevant authorizing order, shall be included in the sealed envelope.

8.      **Challenges by a Party to Designation as "Confidential."** Any "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" designation is subject to challenge by any party or non-party with standing to object. Before filing any motions or objections to a confidentiality designation with the Court, the objecting party shall have an obligation to meet and confer in a good faith effort with the party or non-party that designated the document(s) to resolve the objection by agreement. If agreement is reached confirming or waiving the "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" designation as to any RESPONSIVE DOCUMENTS subject to the objection, the designating party shall serve on all parties a written notice specifying the RESPONSIVE DOCUMENTS and the nature of the agreement.

9.      **Action by the Court.** Applications to the Court for an order relating to any RESPONSIVE DOCUMENTS designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" shall be by motion, with the producing party retaining the burden of establishing good cause. Nothing in this Order, or any action or agreement of a party under this Order, releases any party from his/her/its obligations under the applicable law or limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any RESPONSIVE DOCUMENTS produced or used in discovery or at trial.

10.     **Use of Confidential RESPONSIVE DOCUMENTS or Information at Trial.** If a party intends to present at trial "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" RESPONSIVE DOCUMENTS or information derived therefrom, such party shall provide advance notice to the producing party at least five (5) days before the commencement of trial by identifying the RESPONSIVE DOCUMENTS or information at issue as specifically as possible (*e.g.*, by Bates number, page range, deposition transcript lines, etc.). If any party seeks to use deposition testimony or other information designated as "CONFIDENTIAL – SUBJECT TO

PROTECTIVE ORDER" as rebuttal evidence or for impeachment purposes, the party seeking to use such information shall, as soon as reasonably practical, without divulging the information to any third parties, notify the Court and the producing party of its intent to use such information. The Court may thereafter make such orders as are necessary to govern the use of such RESPONSIVE DOCUMENTS or information at trial.

11.    **Right to Assert Other Objections.** By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any RESPONSIVE DOCUMENTS or information. Similarly, no Party waives any right to object on any ground to the use in evidence of any RESPONSIVE DOCUMENTS or information covered by this Protective Order.

12.    **Obligations on Conclusion of Litigation.**

(a)    **Order Remains in Effect.** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)    **Destruction of "CONFIDENTIAL" RESPONSIVE DOCUMENTS.** Within 60-days after dismissal, settlement, or entry of final judgment not subject to further appeal, all RESPONSIVE DOCUMENTS treated as "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" under this Order, including duplicates as defined herein, shall be destroyed, unless the RESPONSIVE DOCUMENT has been offered into evidence, introduced as an exhibit at a deposition, or filed without restriction as to disclosure. Notwithstanding the above requirements to destroy RESPONSIVE DOCUMENTS, counsel may retain attorney work product, including an index that refers or relates to information designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER," so long as that work product does not duplicate verbatim substantial portions of the text or images of confidential RESPONSIVE DOCUMENTS. This work product

shall continue to be "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" under this Order. An attorney may use his or her work product in a subsequent litigation provided that its use does not disclose or use "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" RESPONSIVE DOCUMENTS or information.

(c)    **Return of RESPONSIVE DOCUMENTS Filed under Seal.** After dismissal or entry of final judgment not subject to further appeal, the Clerk may elect to return to counsel for the parties or, after notice, destroy RESPONSIVE DOCUMENTS filed or offered at trial under seal or otherwise restricted by the Court as to disclosure.

13.    **Order Subject to Modification.** This Order shall be subject to modification by motion of a party or any other person with standing concerning the subject matter.

14.    **No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any RESPONSIVE DOCUMENTS or information designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" by counsel or the parties is subject to protection under applicable law or otherwise until such time as the Court may rule on a specific RESPONSIVE DOCUMENT or issue.

15.    **Persons Bound.** This Order shall take effect when entered and is binding upon all counsel and their law firms, the parties, and persons made subject to this Order by its terms.

IT IS SO ORDERED.

Date: _____    Hon. _____ _____

Dated: April 11, 2025                          FAEGRE DRINKER BIDDLE & REATH LLP


                                               By: _____
                                                     Nicholas J. Begakis

                                               Attorneys for Third-Party Subpoena Respondent
                                               TIKTOK INC.


Dated: April 11, 2025


                                               By: _____
                                                     Nima Gharavi

                                               *Pro se*

**ATTACHMENT A**

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NIMA GHARAVI | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )    Civil Action No. 2:25-mc-00002-UA |
| | ) |
| TIKTOK INC., TIKTOK LTD., | ) |
| TIKTOK PTE. LTD., and TIKTOK U.S. | ) |
| DATA SECURITY INC. | ) |
| | ) |
|     Third-Party Subpoena Respondents. | ) |

**<u>ACKNOWLEDGMENT OF UNDERSTANDING AND AGREEMENT TO BE BOUND</u>**

    The undersigned hereby acknowledges that he/she has read the Stipulated Confidentiality and Protective Order filed in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Central District of California in matters relating to the Stipulated Confidentiality and Protective Order and understands that the terms of the Stipulated Confidentiality and Protective Order obligate him/her to use RESPONSIVE DOCUMENTS designated "CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER" in accordance with the Order solely for the purposes of the above-captioned action and not to disclose any such RESPONSIVE DOCUMENTS or information derived directly therefrom with any other person, firm, or concern.

    The undersigned acknowledges that violation of the Protective Order may result in penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

Date: _____        Signature: _____

# Exhibit B

NIMA GHARAVI
dmca@midwestwrestle.com
4610 North Clark St. #1098
Chicago, IL 60640
+1 (773) 899-4688

Plaintiff *Pro Se*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| IN RE DIGITAL MILLENNIUM COPYRIGHT ACT SECTION 512(h) SUBPOENA TO TIKTOK INC., TIKTOK LTD., TIKTOK PTE. LTD., AND TIKTOK U.S. DATA SECURITY INC. | Case No.: 2-25-mc-00002-UA<br><br>**DECLARATION OF NIMA GHARAVI IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT TIKTOK INC.'S MOTION FOR PROTECTIVE ORDER** |

I, Nima Gharavi, declare as follows:

i.   I am over 18 years of age and competent to make this declaration. I am a *pro se* litigant in this matter and I have no formal legal training aside from having graduated police academy in 2004.  I have not attended law school, nor am I admitted to practice before any bar. If called to testify as a witness, I could and would testify truthfully under oath to each of the statements in this declaration. I make each statement below based on my personal knowledge or after investigation of the relevant information.

## I. Introduction and Personal Background

1.  I obtained a DMCA subpoena from the Central District of California on January 13, 2025.

2.  I arranged for the subpoena to be served on TikTok Inc. ("TTI") on January 18, 2025, via certified mail.

3.  TTI received the subpoena on January 27, 2025, as confirmed by certified mail tracking.

4.  TTI's counsel, Bryan D. Pasciak, acknowledged receipt of the subpoena via email on January 30, 2025, and requested a two-week extension, which I granted. A true and correct copy of this email is attached as Exhibit 1.

## II. Communications with TTI Regarding the Subpoena

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

5. On February 11, 2025, I had a phone call with TTI's counsel, Bryan D. Pasciak. During this call, Pasciak requested an "indefinite extension" and stated that TTI requires confidentiality agreements for all basic subscriber information productions.

6. I declined both the indefinite extension (though agreeing to a second two-week extension) and the confidentiality agreement, citing that 17 U.S.C. 512(h)(2)(C) already provides statutory safeguards.

7. On February 14, 2025, Pasciak sent me an email stating that "TikTok needs a confidentiality order to protect itself." A true and correct copy of this email is attached as Exhibit 2. I have highlighted the phrase "protect itself" for emphasis.

8. On February 27, 2025, Pasciak sent me another email stating that requiring a confidentiality agreement is "our practice in responding to all subpoenas requesting this information." A true and correct copy of this email is attached as Exhibit 3. I have highlighted the phrase "all subpoenas" for emphasis.

9. On March 11, 2025, Pasciak informed me via email of TTI's intent to file a Motion for Protective Order.

10. I responded by inquiring about the in-person meet and confer requirement, given our shared location in Cook County, Illinois.

---

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

11. Pasciak replied on March 18, 2025, stating that his LA colleague (presumably Kendal C. Mitchell, whom he had copied on previous correspondence) would handle the filing.

12. I immediately reached out to Mitchell on March 18, 2025, but as of April 6, 2025, it has been well over 10 days since I reached out to Mitchell, and to this day I have still heard nothing back from Mitchell.

III. TTI's Filings and Citations

13. I have reviewed TTI's portion of this joint stipulation, which cites several cases in an attempt to support its request for a protective order. A true and correct copy of TTI's portion of the joint stipulation is attached as Exhibit 8.

14. I have observed that none of the cases TTI cited involve DMCA subpoenas that were subject to 17 U.S.C. 512(h)(2)(C).

15. I have observed that the cases TTI relies on involve Section 512(a) service providers (ISPs) rather than Section 512(c) service providers like itself.

16. Based on my research and understanding, ISPs by their nature may allow for potential misidentification because an Internet Protocol address associated with an ISP could be accessible by individuals other than the subscriber, for example, through an unprotected Wi-Fi hotspot.

17. I have observed that TTI is a Section 512(c) Service Provider with user authentication measures. TTI's platform requires not only a username and

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

password to access, but also employs a second-factor authentication mechanism. This involves sending a six-digit code to either an email address or via text message to the user's phone. A true and correct copy of TTI's account verification process documentation is attached as Exhibit 5.

IV. The Mintz Case

18. On February 14, 2025, TTI's counsel, Bryan D. Pasciak, raised the Mintz case in an email to me, citing it as precedent for requiring a protective order before producing subscriber information. A true and correct copy of this email is attached as Exhibit 2.

19. On February 15, 2025, I responded to Pasciak's email, explaining that the Mintz case is highly distinguishable from the instant matter.

20. I explained that the Mintz court granted a protective order because the subscriber information at issue included Call Detail Records (CDR) such as telephone numbers called, cell site information (i.e., geolocation), and call duration, which the court deemed private enough to warrant in-camera review.

21. I further explained that the Mintz court's decision was based on the fact that the plaintiff partially paid for the cost of the Blackberry device, increasing his expectation of privacy. In contrast, the instant matter involves free social media accounts, where users have no expectation of privacy in basic subscriber information.

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

22. Despite my detailed counterarguments, Pasciak did not acknowledge or respond to my arguments addressing the Mintz case, and instead chose to use the Mintz case citation in TTI's portion of the joint stipulation without addressing the distinctions I raised.

V. TTI's Notification Policies and Practices

23. I have reviewed TTI's "Law Enforcement Guidelines" which state: "It is our policy to notify TikTok users before disclosing their data..." A true and correct copy of these guidelines is attached as Exhibit 4.

24. Based on my research, I understand that the DMCA subpoena mechanism was designed to allow copyright holders to identify alleged infringers without filing a lawsuit.

25. I have no recollection of nor any tangible record of TTI's assertion that "the Parties agreed the other entities that received the subpoena would have no obligation to provide a further response."

26. TTI's position that individuals subject to this subpoena are "unknown" with "no ability to object" directly contradicts their own "TikTok Law Enforcement Guidelines," which explicitly state: "It is our policy to notify TikTok users before disclosing their data..."

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

27. TTI's obligation is straightforward: notify users of the subpoena, allow them a reasonable period to file a motion to quash, and then produce the BSI if users have not done so after the notification period expires.

28. TTI's assertion that I would have "unbridled ability to publish this information without restraint" is false and misleading. I have consistently maintained that the information is already subject to the restrictions imposed by the sworn declaration required under 17 U.S.C. § 512(h)(2)(C).

## VI. Burden on *Pro Se* Litigants

29. Based on my experience and research, filing under seal requires (1) an application to file under seal, (2) a declaration in support of the application, (3) a proposed order, (4) a redacted version of the document to be filed, (5) an unredacted version of the document to be filed, and (6) a proof of service.

30. As a *pro se* litigant without legal training, I find this process unnecessarily burdensome.

31. I have observed that TTI's proposed protective order would apply not only to the information obtained through the subpoena but also to any documents that reference that information, which would require filing under seal any complaint that identifies the alleged infringers.

## VII. My Experience with DMCA Subpoenas

32. I have filed DMCA subpoenas in other cases and observed that courts have enforced them without imposing protective orders.

33. In Gharavi v. Tumblr, Inc., Case No. 1:24-cv-12718 (N.D. Ill. 2024), I filed the BSI production with the court as an exhibit to a motion.

34. In In re DMCA Subpoena to Reddit, Inc., Case No. 4:25-mc-80002-DMR (N.D. Cal. 2025), I also filed the BSI production with the court as an exhibit to a motion.

35. In both cases, the courts ruled on the merits of the motions without any suggestion that filing BSI productions with the court was improper.

VIII. TTI's Response Times to DMCA Notices

36. Based on my observations, TTI has repeatedly sought extensions and imposed additional requirements beyond those specified in the DMCA.

37. I have spent several days organizing data and running statistical analyses to create a scorecard comparing TTI to its peers.

38. Based on my research and personal experience, when it comes to meeting the requirements for "expeditiously" disabling infringing content in response to valid takedown notices, the majority of platforms—Facebook, YouTube, Instagram and X Corp—average a response time of less than a day (between 0 to 13 hours). Tumblr and Reddit average two days to respond. TTI's average response time is 30 days. A true and correct copy of a comparative analysis of response times across major platforms is attached as Exhibit 7.

39. Based on my statistical analysis of this data, temporarily excluding TTI as an outlier from the rest of its cohort, with a data set of 0, 0, 0, 1, 2, 2, the mean is 0.833 days and the standard deviation is 0.898 days. At 30 days, TTI's average response time is 32.497 standard deviations away from the mean.

40. I have observed that TTI's response times do not vary materially regardless of the quantity of videos in each report. Even reports containing only two, four, or six allegedly infringed works resulted in response times of 25, 27, and 30 days respectively. A true and correct copy of a TTI's response times across all DMCA takedown notices included in the analysis is attached as Exhibit 7 at 2.

41. Based on my experience, TTI has failed to disable access to many of the infringing accounts, despite receiving valid DMCA takedown notices from me. For example, I submitted valid takedown notices identifying 48 allegedly infringing videos from one user, 31 from another, and 24 from a third. Despite these substantial numbers of alleged infringements, these accounts remained active as of April 3, 2025.

IX. TTI's Financial Interest in Infringing Content

42. I have personally paid for a subscription to access infringing content on TTI's platform. A true and correct copy of my subscription payment receipt is attached as Exhibit 9.

43. Based on my research, according to TTI's own website, "After app store fees, TikTok splits the revenue up to 50/50 with you."

---

DECLARATION OF NIMA GHARAVI IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER
CASE NO.: 2-25-mc-00002-UA

44. Based on my research, "TikTok made 77% of its revenue from advertising, with the rest coming from commerce and in-app purchases."

XI. Highlighting in Exhibits

45. I have highlighted certain phrases in Exhibits 2 and 3 for emphasis. Specifically, I highlighted "protect itself" in Exhibit 2 and "all subpoenas" in Exhibit 3. These highlights were added by me and were not present in the original emails.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 7, 2025 at Chicago, Illinois.

/s/ Nima Gharavi

Nima Gharavi

Plaintiff *Pro Se*

# Exhibit B

## Attachment:

# Exhibit 1

**Nima Gharavi**

---

| | |
|---|---|
| **From:** | Pasciak, Bryan D. <bryan.pasciak@faegredrinker.com> |
| **Sent:** | Thursday, January 30, 2025 4:27 PM |
| **To:** | dmca@midwestwrestle.com |
| **Subject:** | TikTok Subpoena |

[External email - use caution]

Mr. Gharavi,

I represent TikTok in the subpoena you served in the Central District of California. I recently received the subpoena and saw the January 31 deadline. Would you agree to a two-week extension for any responses and objections? Once I've had a chance to analyze the requests, I'd like to schedule a call when you're available to discuss the requested information. Thank you.

Bryan

**Bryan D. Pasciak**
Partner
bryan.pasciak@faegredrinker.com
Connect: vCard

+1 312 356 5037 direct / +1 312 796 4251 mobile

**Faegre Drinker Biddle & Reath LLP**
320 South Canal Street, Suite 3300
Chicago, Illinois 60606, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

# Exhibit B Attachment:

# Exhibit 2

**From:** Pasciak, Bryan D. <bryan.pasciak@faegredrinker.com>
**Sent:** Friday, February 14, 2025 3:43 PM
**To:** Nima Gharavi <nima@midwestwrestle.com>
**Subject:** RE: TikTok Subpoena

Nima,

Following up on our call, TikTok is willing to produce basic subscriber information (*e.g.*, email address, phone number, username, IP address, etc.) for all accounts identified in your subpoena. We will, however, need a confidentiality order. Based on our discussion, TikTok's production of the basic subscriber information is all that is sought under the subpoena.

On our prior call, you mentioned the applicable statute requires you to provide a sworn declaration stating the purpose for which the subpoena and information are sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting your rights under the statute. But while this identifies the purpose for which the information can be used, it does not limit how you can use the information to obtain that purpose. For example, while I understand you would not do this, the declaration would not prohibit you from posting the information on social media or another public location, as long as the purpose was consistent with the statute.

Based on this, TikTok needs a confidentiality order to protect itself in producing the confidential data, which is common practice. *See, e.g.*, *Mintz v. Mark Bartelstein & Assocs., Inc.*, 885 F. Supp. 987, 1000 (C.D. Cal. 2012) (ordering user's subscriber information to be produced after entry of a protective order). We have a standard document I've used many times for BSI productions, which I can provide for your review. Please confirm whether you agree.

Also as we discussed, it will take some time for TikTok to complete the production. You mentioned a willingness to provide an extension(s) as we work through the productions, but would not agree to an indefinite extension. Would you agree to two weeks from today, and then we can further discuss if another extension is necessary? TikTok will begin gathering the necessary data.

Let me know if you have any questions. Thank you.

Bryan

**Bryan D. Pasciak**
Partner
bryan.pasciak@faegredrinker.com
Connect: vCard

+1 312 356 5037 direct / +1 312 796 4251 mobile

**Faegre Drinker Biddle & Reath** LLP
320 South Canal Street, Suite 3300
Chicago, Illinois 60606, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

Highlight added for emphasis by Nima Gharavi

# Exhibit B Attachment:

# Exhibit 3

**From:** Pasciak, Bryan D. <bryan.pasciak@faegredrinker.com>
**Sent:** Thursday, February 27, 2025 12:08 PM
**To:** Nima Gharavi <nima@midwestwrestle.com>
**Subject:** RE: TikTok Subpoena

Nima,

Following up and responding to your subpoena and email below, TikTok is willing to produce the applicable basic subscriber information in response to your subpoena, but will require a protective order entered by the Court, as is our practice in responding to all subpoenas requesting this information. We believe the quickest and most efficient way for you to obtain this information is to agree to file a stipulated protective order, and we will produce the BSI after the Protective Order is entered by the Court. To the extent you disagree, TikTok will file a motion for a protective order, you can oppose it, and we can wait for the Court to issue an order on this topic.

In response to your comments, there are many cases where courts entered protective orders governing the production of subscriber information under similar circumstances. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, 2018 WL 10604533, at *3 (N.D. Cal. Sept. 14, 2018) ("any threat to the subscriber's privacy is necessarily reduced because the Court has already included several safeguards in the order authorizing the subpoena and Plaintiff has unambiguously stated that it is willing to enter into a protective order to preserve the confidentiality of the subscriber information"); *Hard Drive Productions v. Does 1-48*, 2012 WL 2196038, at *6 (N.D. Ill. June 14, 2012) ("This court notes that the circumstances here might be particularly appropriate for the issuance of a protective order allowing any information released by the ISPs to be treated as confidential"); *After II Movie, LLC v. Grande Comms. Networks LLC*, 2023 WL 3094122, at *2 (W.D. Tex. Apr. 26, 2023) ("the Court's order protecting the privacy of the subscribers' information and limiting its use adequately addresses the objectors' concerns"); *Strike 3 Holdings, LLC v. Doe*, 2023 WL 4922590, at *3 (E.D. Tex. Aug. 1, 2023) (noting a protective order was entered to adequately protect privacy interests related to subscriber information).

Such an order would not contradict the Congressional intent behind a DMCA subpoena, as it would not prohibit you in any way from obtaining any judicial remedies available under the law. You would still be able to use the information consistent with the protective order to identify and pursue claims against the applicable entities. The comments on whether the DMCA mentions a protective order are irrelevant to this analysis, as your email admits is silent on the matter, which makes sense given the wide-ranging information that could be used to "identify the alleged infringer." For example, depending on the context, information used to identify an alleged infringer could range from a Social Security Number to someone's name. Further, the citation to PACER's login banner discussing Personal Identifying Information is merely one example of confidential information and certainly does not encompass the scope of all protected information.

For example, California's Consumer Privacy Act ("CCPA") defines "personal information" to include "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household," which the statute states may include a "unique personal identifier, online identifier, Internet Protocol address, email address, account name, . . . or other similar identifiers." Cal. Civ. Code § 1798.140(v)(1)(A). The CCPA is clear it "is the intent of the Legislature to ensure that personal information about California residents is ***protected***." *Id.* §§ 1798.81.5(a)(1) (emphasis added).

Highlight added for emphasis by Nima Gharavi

Thus, we are simply taking reasonable steps to protect this personal information, while ensuring you receive and can use it to pursue your claims. Attached is a draft protective order we have used for BSI subpoenas, with minor edits for this case. Let me know if you would like to discuss its language to ensure you are able to use the information while pursuing your claims. Thank you.

Bryan

**Bryan D. Pasciak**
Partner
bryan.pasciak@faegredrinker.com
Connect: vCard

+1 312 356 5037 direct / +1 312 796 4251 mobile

—————

**Faegre Drinker Biddle & Reath** LLP
320 South Canal Street, Suite 3300
Chicago, Illinois 60606, USA

This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

# Exhibit B Attachment:

# Exhibit 4



# TikTok Law Enforcement Guidelines

*Last updated: May 11, 2023*

These guidelines ("**Guidelines**") are a reference for law enforcement officials seeking the data of users of the TikTok platform (the "**Platform**") from any of the TikTok entities listed in Section 1 below (together "**TikTok**"). For additional information, see our Law Enforcement FAQS    .

In line with our human rights statement    , TikTok is committed to cooperating with law enforcement while respecting the privacy, freedom of expression, and other rights of its users.

To achieve this, in addition to these Guidelines, TikTok has internal policies and procedures governing how TikTok handles and responds to law enforcement requests. These procedures are informed by legal and human rights standards and have been developed in a way that seeks to limit adverse human rights impacts, while enabling TikTok to comply with legitimate, valid legal requests from law enforcement to disclose user data.

We reject requests which go against our policies and procedures.

## 1. Basic Requirements

First, requests must be addressed to the correct TikTok entity. This is based on the location of the relevant user as follows:

| | |
|---|---|
| **TikTok Inc.**<br>5800 Bristol Parkway, Suite 100<br>Culver City, CA 90230<br>UNITED STATES | Requests for data of users located in the United States |
| **TikTok Information Technologies UK Limited**<br>4 Lindsey Street<br>Barbican<br>London, EC1A 9HP<br>UNITED KINGDOM | Requests for data of users located in the United Kingdom |
| **TikTok Technology Limited**<br>10 Earlsfort Terrace<br>Dublin, D02 T380<br>IRELAND | Requests for data of users located in the European Economic Area (EU Member States, plus Iceland, Liechtenstein, and Norway) and Switzerland. |

# ♪ TikTok

| #20-10, South Tower, |
| SINGAPORE 048583 |

Please note that requests addressed to the incorrect TikTok entity may not be processed until this error has been rectified, which may cause unnecessary delay.

Second, requests must be submitted to our webform: www.tiktok.com/legal/report/lawenforcementrequest with any attachments (for example, official warrant, court order, or other documentation supporting the request) in PDF format.

Any confirmation of receipt of correspondence is for convenience only and, in doing so, TikTok does not waive any right of objection (including for lack of jurisdiction, invalid legal process or lack of proper service). All requests to TikTok and any supporting documents (including orders, warrants, and/or subpoenas or equivalent) must be provided in English or with a translation. TikTok will not respond to requests for user data sent by non-law enforcement officials or when they are sent through informal channels.

## 2. Types of User Data

TikTok may hold the following user data which can be the subject of a valid law enforcement request:

| Data type | Examples (non-exhaustive) |
|---|---|
| Subscriber information | TikTok username<br>Email address (depending on user's sign-up method)<br>Phone number (depending on user's sign-up method)<br>Account creation date<br>IP address at account creation<br>Device information |
| Log-in / log-out data | IP address of account login / logouts |
| Interaction data (non-content) | IP address logs for interactions (for a specified period only)<br>Video creation time / date |
| Content data | Video content<br>Comments<br>Direct message content |

Each request must clearly specify the type of data requested and the legal basis for requesting it. If the request does not meet the applicable legal requirements for the requested data (as listed in Section 3 below), the data will not be disclosed. This is in particular the case for requests relating to content data (which generally require a domestic court / judicial order, warrant or equivalent).

## 3. Requirements When Making a Request

**TikTok**

- **Details of requesting law enforcement authority (or Court)**:

  ○ **Requesting Authority (or Court)**: The name and location of the law enforcement authority. In the case of a Court order, the request should indicate the location and name of the relevant Court and judge / magistrate.

  ○ **Requesting officer**: The requesting officer's name, badge / identification number, email address (this must be from an official email domain) and phone number (including any direct dial extension).

- **Details of relevant user account**:

  ○ **TikTok username**: When requesting data regarding a specific user of the Platform, you must provide a specific TikTok username or an approved account identifier associated with the relevant account. We also request that a screenshot of the relevant account be provided (to help us to identify the correct account more quickly). The following are TikTok approved identifiers:

    ▪ TikTok User ID

    ▪ TikTok username (account URL or screenshot accepted)

    ▪ Phone number

    ▪ Email address

    ▪ Video ID (video URL or screenshot accepted)

  ○ **Data requested**: The request should clearly specify the scope of the data requested. Overly broad requests will be refused.

  ○ **Date range**: The request must specify a date (and, if possible, a time), or a date range as relevant to the request (for historic data only).

- **Legal basis for the request**:

  ○ **Relevant legal process**: The request should clearly specify the legal process (i.e. citing the relevant article or section of an Act / Statute / Code), which authorizes law enforcement to request and collect information for the purposes of prevention, detection or investigation of criminal offences.

  ○ **Context and Offence(s) under investigation**: The request should separately indicate the type of offence(s) under investigation (citing the relevant Act / Statute / Code), the circumstances of the offence and in what way it is connected to the Platform.

  ○ **User notification**: Please indicate whether user notification is permitted (see Section 4 below).

# 4. User Notifications

It is our policy to notify TikTok users before disclosing their data to law enforcement, unless providing such notice: (a) is prohibited under applicable law; (b) would jeopardize an investigation; and/or (c) would put individuals at risk of harm. It is the responsibility of the requesting law enforcement authority to clearly indicate in their request whether any of these criteria are met. TikTok will honour such requests where appropriate supporting information is provided (for example, if a request makes reference to a non-disclosure obligation under applicable law).

♪ TikTok

## 5. Preservation Requests

TikTok will honor formal requests to preserve user data for 90 days. Please submit all preservation requests to our webform: www.tiktok.com/legal/report/lawenforcementrequest   with your preservation request attached in PDF format.

Preservation requests must be sent on law enforcement letterhead, signed, and must clearly identify the specific user data to be preserved (by reference to username, the data type and date ranges as per Section 3 above). TikTok will preserve information for an additional 90-day period upon receipt of a formal request to extend the preservation. We may not honour multiple extension requests beyond one additional 90-day period. If TikTok does not receive formal legal process for the preserved information before the end of the preservation period, the preserved information may be deleted when the preservation period expires.

Overly broad or unspecific preservation requests will not be actioned. To seek disclosure of preserved data, the requirements set out in Sections 1 and 3 of these Guidelines will apply.

## 6. Emergency Requests

TikTok has processes in place to handle emergency requests. Such requests are evaluated on a case-by-case basis: if as part of an emergency request we receive information that is sufficient in our assessment to establish a good faith belief that there is an emergency involving imminent harm or the risk of death or serious physical injury to a person, we may provide user data necessary to prevent that harm, as permitted by applicable law.

*To request this data, you must submit your request through the* Emergency Disclosure Request Form   .

All emergency requests must be made by a sworn law enforcement official, and come from an official law enforcement email domain (if sent via email). Non-law enforcement personnel aware of an emergency situation should immediately and directly contact local law enforcement officials.

## 7. Other

TikTok may request that a law enforcement authority submit a request for legal assistance to designated government authorities under the Mutual Legal Assistance Treaty ("**MLAT**") framework, or by letters rogatory. This may arise in circumstances where the requesting law enforcement authority is located in a different country to the TikTok entity that provides the service to the relevant user whose data is requested (refer to Section 1 above). See our Law Enforcement FAQs   for more information in relation to MLAT.

In submitting a request, law enforcement officials are required to ensure that any information provided is complete and accurate to the best of their knowledge and good faith belief, and that the disclosure (or other action) requested is necessary and proportionate for the purposes of the prevention, detection or investigation of offences, or to prevent an emergency. Once received by law enforcement, the law



TikTok reserves the right to seek reimbursement for the costs associated with responding to law
enforcement requests.

TikTok may update these Guidelines from time to time, and such changes may be informed by a range of
factors, including legal or human rights developments, operational and/or product changes to the Platform.
All relevant updates will be reflected on the TikTok website.

# TikTok Law Enforcement Frequently Asked Questions ("FAQS")

*These FAQS should be read together with TikTok's* Law Enforcement Guidelines

## Q: What is TikTok's approach to handling data requests from law enforcement authorities?

TikTok is committed to cooperating with law enforcement while respecting the privacy, freedom of
expression, and other rights of our users. To achieve this, in addition to these Guidelines, TikTok has internal
policies governing how TikTok handles and responds to law enforcement requests. These procedures are
informed by legal and human rights standards and have been developed in a way that seeks to limit adverse
human rights impacts, while enabling TikTok to comply with legitimate, valid legal requests from law
enforcement to disclose user data.

All requests received undergo a case-by-case assessment by TikTok's dedicated law enforcement response
team before any user data is disclosed. This team is trained to evaluate requests from law enforcement
authorities and frequently engages in outreach to communicate TikTok's requirements for disclosing user
data to law enforcement authorities.

## Q: What are TikTok's requirements for disclosing user data to law enforcement authorities?

TikTok's requirements for disclosing user data to law enforcement authorities are clearly set out in our
Law Enforcement Guidelines    (in particular see Sections 1 and 3). These requirements reflect our internal
policies and procedures for handling requests from law enforcement authorities, and are based on applicable
legal requirements and our commitment to international human rights, including the International Bill of
Human Rights. Because the applicable laws vary from one country to another, the rules on when data can
legally be disclosed will also vary to some extent and our internal policies and procedures reflect this while at
the same time reflecting our global commitments to freedom of expression and privacy.

## Q: How do I find the TikTok username?



## Q: Does TikTok ever reject data requests from law enforcement authorities?

Yes, TikTok rejects data requests from law enforcement authorities where they do not meet the requirements that are clearly set out in our Law Enforcement Guidelines . The most common examples are as follows:

- Requests that are not addressed to the correct TikTok entity;

- Requests that do not specify the legal process which authorizes law enforcement to request and collect information;

- Requests that do not indicate the type of offence(s) under investigation, the circumstances of the offence(s) and in what way it/they are connected to TikTok; and

- Overly broad requests for "all user data" or where there are no date ranges indicated.

## Q: How else does TikTok ensure that requests from law enforcement authorities are valid?

Aside from rejecting requests from law enforcement authorities that are not made in accordance with the relevant legal processes and requirements, TikTok will in accordance with applicable law:

- seek to narrow the scope of data requests in terms of the volume of data requested, the number of users they relate to and/or the time period to which they relate;

- ask for further information in support of the request (in particular, for details of the relevant legal process and/or the type of offence(s) under investigation); or

- communicate to the requesting law enforcement authorities that a request via the Mutual Legal Assistance Treaty ("**MLAT**") process is necessary to obtain disclosure of the requested data.

## Q: Does TikTok ever disclose user data outside of formal legal requests?

TikTok may disclose user data without receiving a formal legal request (based on valid legal process) in the following cases:

- **Emergency circumstances**: As explained in Section 5 of our Law Enforcement Guidelines , where satisfied there is an emergency involving imminent harm or risk of death or serious physical injury to a person, we may provide user data necessary to prevent that harm, as permitted by applicable law.

- **Reporting obligations**: In certain circumstances, TikTok is subject to legal obligations to report certain user data either to law enforcement authorities or to designated bodies such as the U.S. National Center for Missing and Exploited Children ("**NCMEC**").

## Q: What type of scenarios would constitute an emergency?

♪ TikTok

- Cases of child safety and exploitation;

- Missing persons;

- Suicide and self-injury scenarios;

- Imminent threats of violence; or

- Natural or man-made disaster situations (such as fires, floods, earthquakes, etc).

## Q: Does TikTok accept data requests from law enforcement authorities in all countries?

While law enforcement authorities in any country can submit a request to TikTok, the requirements for data disclosure will vary depending on the location of the user, the location of the requesting law enforcement authority and, in certain cases, the type of data requested. In certain circumstances, TikTok will communicate to a law enforcement authority that a request via the Mutual Legal Assistance Treaty process (known as "**MLAT**") is necessary to obtain disclosure of the requested data. TikTok publishes Transparency Reports with information on the number of requests received from each country.

## Q: What is a Mutual Legal Assistance Treaty ("MLAT")?

An MLAT is a treaty between two or more countries that defines how each will assist in legal matters, such as in criminal investigations. Through an MLAT, the government of one country can seek assistance from the government of another country in obtaining information from companies located in the other country.

## Q: In what circumstances may it be necessary for law enforcement authorities to rely on the MLAT process?

It may be necessary in circumstances where the requesting law enforcement authority is located in a different country to the TikTok entity that provides the service to the relevant user (see Section 1 of our Law Enforcement Guidelines ). If law enforcement are unclear as to whether they should rely on MLAT, they can contact TikTok. On receipt of such a request, TikTok will endeavour to communicate to the law enforcement authority whether MLAT is appropriate and to direct them to the designated "central authority" for MLAT purposes in the appropriate country.

For example, for users located outside the US, UK, EEA and Switzerland, the TikTok service is provided by TikTok's Singapore entity. In this example, we would communicate to the requesting law enforcement authority (if they are located outside Singapore) that they must submit a request to Singapore's "central authority" for MLAT purposes, if they wish to proceed with their request for disclosure of user data by TikTok's Singapore entity.

## Q: Where should non-law enforcement requests be sent?

Non-law enforcement requests should be directed as follows:

- **Report Content**: Details of how to report various types of content that may be in breach of TikTok's Community Guidelines are available here .

- **Report IP infringement**: Reports of alleged copyright or trademark infringement should be made in accordance with TikTok's Intellectual Property Policy and can be filed as a Copyright Infringement Report or as a Trademark Infringement Report .

## Q: How quickly does TikTok process requests?

TikTok's dedicated law enforcement response team endeavours to respond to all requests in a timely manner



does not meet the requirements set out in our Law Enforcement Guidelines    and these
Law Enforcement FAQS    .

## Q: What do I do if I receive a Cybertip report made by TikTok to NCMEC?

If law enforcement has received a Cybertip report made by TikTok to NCMEC, and is now requesting further
user data in connection with an investigation, the request must meet the requirements set out in our
Law Enforcement Guidelines    and these Law Enforcement FAQS    . To help us more efficiently process your
request, please specify in your request the report number assigned to the Cybertip report by NCMEC.

 

### Company

About TikTok

Newsroom

Contact

Careers

ByteDance

### Programs

TikTok for Good

TikTok for Developers

Effect House

Advertise on TikTok

TikTok Browse

TikTok Embeds

TikTok Rewards

Download TikTok

### Resources

Help Center

Safety Center

♪ TikTok

Community Guidelines

Transparency

Accessibility

**Legal**

Terms of Service

Privacy Policy

Intellectual Property Policy

TikTok Law Enforcement Guidelines

Children's Privacy Policy

English ▾

© 2025 TikTok

# Exhibit B Attachment:

# Exhibit 5

# Sign up for TikTok



Use phone or email

Continue with Facebook

Continue with Google

By continuing, you agree to TikTok's **Terms of Service** and confirm that you have read TikTok's **Privacy Policy**.

Already have an account? **Log in**



# Sign up

**When's your birthday?**

| Month ▼ | Day ▼ | Year ▼ |

Your birthday won't be shown publicly.

**Phone**                                   Sign up with email

| US +1 ▼ | Phone number |

| Enter 6-digit code | Send code |

Next

By continuing, you agree to TikTok's **Terms of Service** and confirm that you have read TikTok's **Privacy Policy**.

Already have an account? **Log in**

# Sign up

## When's your birthday?

| Month ▼ | Day ▼ | Year ▼ |

Your birthday won't be shown publicly.

**Email**                                    **Sign up with phone**

Email address

Password  👁

Enter 6-digit code        Send code

Next

By continuing, you agree to TikTok's **Terms of Service** and confirm that you have read TikTok's **Privacy Policy**.

Already have an account? **Log in**

**Nima Gharavi**

| | |
|---|---|
| **From:** | TikTok <noreply@account.tiktok.com> |
| **Sent:** | Monday, March 31, 2025 3:59 PM |
| **To:** | dmca@midwestwrestle.com |
| **Subject:** | 349068 is your verification code |



## Verification Code

To verify your account, enter this code in TikTok:

**349068**

Verification codes expire after 48 hours.

If you didn't request this code, you can ignore this message.

TikTok Support Team

TikTok Help Center: https://support.tiktok.com/

Have a question?
Check out our help center or contact us in the app using **Settings > Report a Problem.**

This is an automatically generated email. Replies to this email address aren't monitored.

Privacy Policy
TikTok, 10100 Venice Bivd, Culver City, CA 90232

  

←  (409) 752-6784 📞 ⋮

4:02 PM

Texting with (409) 752-6784 (SMS/MMS)

[TikTok] 752478 is your verification code, valid for 5 minutes. To keep your account safe, never forward this code.

4:02 PM

 Copy "752478"

   

# Exhibit B Attachment:

# Exhibit 6

Verizon

5:01 Wed, Mar 26



Device control

Media output

YouTube 4:17 PM



**Steve Vondran**

Strike 3 Holdings adult videos is looking for you!



VONDRANLEGAL.COM

**WHY ARE YOU DOWNLOADING STRIKE 3 HOLDINGS VIDEOS?**

**TUSHY | BLACKED VIXEN?**

**BITTORRENT DEFENSE LAWYER**

PLEASE FORGIVE ME STRIKE 3

**WILL YOU BE THEIR NEXT VICTIM?**

Play | Turn Off | Watch Later

 







▶ ⏭ 🔊 0:00 / 2:18  CC ⚙ ⊡ ▭ ⛶

## Strike 3 Holdings adult videos is looking for you!

 Steve Vondran
47.4K subscribers

🔔 Subscribed ⌄          👍 1  👎   ↗ Share   ✦ Ask   ⬇ Download   ✦ Thanks   ✂ Clip   ⋯

177 views · Mar 21, 2025   #vixen #blacked
VondranLegal.com - Feel free to share our videos - thanks for Watching and drop your comments!

Strike 3 Holdings can be BRUTAL. Seeking to get your family to pay up to $50,000 for downloading their videos on BitTorrent. They will serve your ISP with a subpoena to get your name and address (of the account subscriber), and then they will see how much money they can extract from you for alleged copyright infringement. This is not fun, especially in this tight economy. Settlements can be expensive and can range as high as $750 per alleged movie title of their #tushy #blacked and #vixen titles. These federal court copyright lawsuits never come at a good time for anyone, and many people are concerned about remaining anonymous so their friends, families and employers do not find out. Some people also have security clearances and VISAs that make them worry about the nature of these settlements—often referred to as "shame settlements."

Please tell all your friends to NEVER download their Vixen, Blacked, and Tushy adult porn videos. This is considered "willful copyright infringement" to the plaintiff regional law firms and can lead to expensive settlements. Paying for a subscription is a much better idea. Be safe out there.

Vondran Legal® has helped many hundreds of individuals defend these cases, whether seeking a settlement or litigating the case if you are innocent of the allegations.

## Music
1 songs

 When Good Weather Goes Bad (440087)
Dusty Hendrix (BMI)
Heavy Weather and Skinny PSAs

♪ Music

## Transcript
Follow along using the transcript.

Show transcript

 Steve Vondran
47.4K subscribers

▶ Videos   ▤ About   ✕ Twitter   f Facebook   in LinkedIn   Ⓟ Patreon   📷 Instagram

Show less





Seeking as much as $50,000 dollars for their porn vids







They have regional firms looking to collect as much $$ as they can

# Exhibit B
# Attachment:

# Exhibit 7

**DMCA Takedown Notice Response Time (2024 Q4 & 2025 Q1)**

| Service Provider | DMCA Notices | Infringing Works | Average Response (Days) | Avg. Response (Hours) | Avg. Response (Mins) |
|---|---|---|---|---|---|
| TikTok | 8 | 653 | 30 | 725 | 43,474 |
| Reddit | 5 | 20 | 2[1] | 50 | 3,011 |
| Tumblr | 2 | 23 | 2 | 41 | 2,476 |
| X Corp | 14 | 69 | 1 | 13 | 793 |
| Instagram | 9 | 25 | 0 | 6 | 349 |
| YouTube | 12 | 19 | 0 | 1 | 80 |
| Facebook | 2 | 8 | 0 | 0 | 25 |

[1]Reddit has one statistical outlier of 22.9 days that was excluded in keeping with standard statistical analysis practices.  If included, it would increase Reddit's average to 6 days.

| TikTok | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Days Elapsed | Infringing Works |
| 7421630927333425157 | 10/3/24 2:43 PM | 11/12/24 12:09 PM | 39.9 | 103 |
| 7425724357420417029 | 10/14/24 3:08 PM | 11/19/24 10:51 AM | 35.8 | 125 |
| 7436896497670684727 | 11/13/24 6:12 PM | 12/9/24 1:57 PM | 25.8 | 170 |
| 7446103960162304005 | 12/8/24 1:20 PM | 1/9/25 11:42 PM | 32.4 | 140 |
| 7455393344607059974 | 1/2/25 2:30 PM | 1/27/25 7:01 PM | 25.2 | 103 |
| 7456565352013791238 | 1/5/25 6:09 PM | 1/30/25 10:07 PM | 25.2 | 2 |
| 7457617532585967622 | 1/8/25 1:55 PM | 2/4/25 9:50 PM | 27.3 | 4 |
| 7467966585458950149 | 2/5/25 11:17 AM | 3/7/25 8:17 AM | 29.9 | 6 |

| Reddit | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Days Elapsed | Infringing Works |
| 12765806 | 10/21/24 12:19 PM | 10/24/24 9:22 AM | 2.9 | 11 |
| 13052138 | 12/8/24 10:59 AM | 12/9/24 12:30 PM | 1.1 | 3 |
| 13170015 | 12/29/24 2:39 PM | 1/2/25 3:19 AM | 3.5 | 2 |
| 13274789 | 1/13/25 10:15 AM | 2/5/25 7:39 AM | 22.9 | 3 |
| 13430288 | 2/5/25 9:41 AM | 2/6/25 7:11 AM | 0.9 | 1 |

| Tumblr | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Days Elapsed | Infringing Works |
| 10441246 | 10/22/24 1:17 PM | 10/24/24 6:59 AM | 1.7 | 1 |
| 10520985 | 11/24/24 6:55 PM | 11/26/24 11:45 AM | 1.7 | 22 |

| X Corp | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Hours Elapsed | Infringing Works |
| 0379292692 | 10/9/24 6:11 PM | 10/9/24 7:22 PM | 1.2 | 1 |
| 0379356003 | 10/10/24 4:04 PM | 10/10/24 7:01 PM | 3.0 | 1 |
| 0379533063 | 10/14/24 2:51 PM | 10/14/24 8:38 PM | 5.8 | 1 |
| 0380013410 | 10/24/24 10:54 AM | 10/24/24 9:11 PM | 10.3 | 1 |
| 0380036134 | 10/24/24 10:53 PM | 10/25/24 9:57 AM | 11.1 | 1 |
| 0380054846 | 10/25/24 9:24 AM | 10/25/24 7:09 PM | 9.8 | 1 |
| 0380102113 | 10/26/24 1:42 PM | 10/26/24 8:11 PM | 6.5 | 1 |
| 0381866592 | 12/4/24 1:02 PM | 12/4/24 7:51 PM | 6.8 | 7 |
| 0382444884 | 12/18/24 12:09 PM | 12/18/24 2:57 PM | 2.8 | 1 |
| 0382898293 | 12/29/24 2:13 PM | 12/30/24 1:12 PM | 23.0 | 2 |
| 0383246633 | 1/6/25 11:27 PM | 1/7/25 8:04 PM | 20.6 | 2 |
| 0383514167 | 1/12/25 2:57 PM | 1/12/25 5:07 PM | 2.2 | 1 |
| LEGAL-368019 | 2/9/25 11:47 PM | 2/11/25 9:47 AM | 34.0 | 43 |
| LEGAL-411057 | 2/16/25 12:53 PM | 2/18/25 1:08 PM | 48.2 | 6 |

| Instagram | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Hours Elapsed | Infringing Works |
| 1315331846492578 | 10/9/24 5:21 PM | 10/9/24 7:25 PM | 2.1 | 6 |
| 1729740007616389 | 10/9/24 5:30 PM | 10/9/24 7:30 PM | 2.0 | 1 |
| 1078302680353630 | 10/14/24 2:49 PM | 10/14/24 9:59 PM | 7.2 | 2 |
| 1094441858697778 | 12/2/24 1:56 PM | 12/3/24 7:55 AM | 18.0 | 1 |
| 609107314908370 | 12/18/24 4:54 PM | 12/18/24 6:05 PM | 1.2 | 3 |
| 1846802485854087 | 1/1/25 8:47 PM | 1/1/25 9:12 PM | 0.4 | 2 |
| 1329454878080449 | 1/12/25 3:41 PM | 1/13/25 1:38 AM | 10.0 | 1 |
| 1043408394511958 | 3/10/25 10:41 PM | 3/11/25 12:28 AM | 1.8 | 6 |
| 571845121867133 | 3/29/25 11:52 AM | 3/29/25 9:42 PM | 9.8 | 3 |

| YouTube | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Minutes Elapsed | Infringing Works |
| QIFRUFS4EMGFCF5XUJ5WHDXKDQ | 11/4/24 9:45 AM | 11/4/24 10:43 AM | 58 | 1 |
| N5YV6L6SWWZWRTYHAUVSWPQBDM | 11/4/24 9:46 AM | 11/4/24 11:15 AM | 89 | 1 |
| VLS67YJJHAKAVBKFAGQWVC2574 | 11/4/24 11:22 AM | 11/4/24 12:19 PM | 57 | 1 |
| VCU6A7T6Y73IY7BS24GNLDLCHQ | 11/10/24 1:39 PM | 11/10/24 1:40 PM | 1 | 1 |
| IMCRSRUDGYKC2CRY24BLXWQILM | 12/15/24 4:49 PM | 12/15/24 4:49 PM | 0 | 2 |
| 3BJR4CZFYT4BMEPC6LKNWPV6KE | 12/17/24 7:52 AM | 12/17/24 7:52 AM | 0 | 1 |
| X5QQHYFP5SHWW25ZG6YWHVG5SU | 1/1/25 8:27 PM | 1/1/25 9:09 PM | 42 | 1 |
| Z77HQG37CTXV3ROYPIYB52VUSQ | 1/3/25 4:18 PM | 1/3/25 4:18 PM | 0 | 1 |
| 4W5IMFN7ZS2ATIEBKREQPDSQM4 | 1/7/25 8:48 PM | 1/8/25 2:05 AM | 317 | 6 |
| WI2AJXQVVCXES4PU3T6XHJLASA | 2/3/25 7:42 PM | 2/4/25 2:21 AM | 399 | 2 |
| K5NXMM4EIL4RB55JD57AMOLCGI | 3/10/25 10:03 PM | 3/10/25 10:04 PM | 1 | 1 |
| PSCDWU4WJ2A7YT4WD6ARM75I5M | 3/21/25 10:06 AM | 3/21/25 10:06 AM | 0 | 1 |

| Facebook | | | | |
|---|---|---|---|---|
| Report ID | Report Date (CT) | Response Date (CT) | Minutes Elapsed | Infringing Works |
| 2295923907425911 | 10/10/24 3:47 PM | 10/10/24 3:51 PM | 4 | 7 |
| 960317639239255 | 10/10/24 3:59 PM | 10/10/24 4:46 PM | 47 | 1 |

# Exhibit B Attachment:

# Exhibit 8

FAEGRE DRINKER BIDDLE & REATH LLP
[insert]

Attorneys for Defendant
TIKTOK INC.

NIMA GHARAVI
nima@midwestwrestle.com
4610 North Clark Street, St. 1098
Chicago, Illinois 60640

Plaintiff *Pro Se*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIMA GHARAVI,<br><br>       Plaintiff,<br><br>   v.<br><br>TIKTOK INC., TIKTOK LTD., TIKTOK PTE. LTD., and TIKTOK U.S. DATA SECURITY INC.,<br><br>       Third-Party Subpoena Respondents. | Case No. Civil Action No. 2:25-mc-00002-UA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE JOINT STIPULATION REGARDING TIKTOK INC.'S REQUEST FOR ENTRY OF A PROTECTIVE ORDER**<br><br>Date: [x]<br>Time: [x]<br>Hon.: Judge Dolly M. Gee<br>Discovery Cut-Off: N/A<br>Pretrial Conference: N/A<br>Trial Date: N/A |

Pursuant to Local Rule 37, TikTok Inc. ("TTI") and Pro Se Plaintiff Nima Gharavi ("Plaintiff") file the instant Joint Stipulation regarding TTI's Request for the Entry of a Protective Order. TTI's and Plaintiff's only dispute is whether a protective order should be

entered before TTI's production of basic subscriber information ("BSI") in response to Plaintiff's third-party subpoena.

## TIKTOK INC.'S POSITION

## INTRODUCTION

Plaintiff served a subpoena under the Digital Copyright Millennium Act ("DMCA"), 17 U.S.C. § 512(h), requesting information to identify the owners of 22 TikTok accounts. He intends to use this information to pursue copyright claims against the account owners. TTI conferred with the Plaintiff regarding his subpoena and agreed to produce responsive BSI for the TikTok accounts subject to a protective order. The BSI production for each account may include information that could be used to identify and contact the user, including usernames, email addresses, and phone numbers.

There is no dispute regarding what information will be produced. TTI's and Plaintiff's only disagreement is whether a protective order should be entered before the BSI production. The accounts are those of nonparties, who are unable to assert objections or raise other issues in response to the subpoena.

TTI frequently receives subpoenas requesting production of BSI to identify account owners. Under similar circumstances, courts in many jurisdictions across the country, including district courts in the Ninth Circuit, have consistently entered protective orders similar to what TTI proposes in this case. TTI sent Plaintiff its standard protective order used for these purposes, and offered to confer regarding its terms to ensure Plaintiff is able to effectively use the information in pursuing his claims. To be clear, TTI in no way attempts

to prohibit Plaintiff from obtaining BSI, frustrate the purposes of 17 U.S.C. § 512(h), or limit Plaintiff's ability to pursue his copyright claims. Plaintiff, however, refuses to consider any protective order, which forms the basis for this filing.

Good cause exists for entry of a protective order, and pro se Plaintiff's position is inconsistent with decisions of federal courts across the country under similar circumstances. Many judges have recognized the benefit of reasonably safeguarding the interests of currently unknown individuals with no ability to object, identify currently unknown issues, or assert their position in relation to the public and unrestrained disclosure of their BSI. *See, e.g.*, *Strike 3 Holdings, LLC v. Doe*, No. 18-cv-02019, 2018 WL 10604533, at *3 (N.D. Cal. Sept. 14, 2018); *Hard Drive Productions v. Does 1-48*, No. 11-cv-9062, 2012 WL 2196038, at *6 (N.D. Ill. June 14, 2012); *After II Movie, LLC v. Grande Comms. Networks LLC*, No. 1:21-cv-00709, 2023 WL 3094122, at *2 (W.D. Tex. Apr. 26, 2023); *Strike 3 Holdings, LLC v. Doe*, No. 4:22-cv-879, 2023 WL 4922590, at *3 (E.D. Tex. Aug. 1, 2023).

Further, TTI's position is consistent with this court's prior guidance in *Mintz v. Mark Bartelstein & Assocs., Inc.*, 885 F.Supp.2d 987 (C.D. Cal. Aug. 14, 2012). In *Mintz*, this court required production of subscriber information, but balanced the parties' interests and held any concerns by the disclosing party "can be adequately protected with an appropriate protective order." *Id.* at 1000. As requested here by TTI, the *Mintz* court required the parties to submit a stipulated protective order, which would be entered before the subscriber information was produced. *Id.*

Neither party to the subpoena knows the account owners, their position(s) on the public disclosure of subscriber information, or (as more fully discussed below) other unique circumstances that may apply. There is currently no benefit to upending established procedures to allow Plaintiff an unbridled ability to publish this information without restraint. Under TTI's proposal, Plaintiff will receive this information, be able to use it in pursuing his claims, and will experience no prejudice in this matter. TTI, therefore, requests that the Court enter the protective order attached to the Declaration of [x] as **Exhibit A**.

## RELEVANT FACTS

### A.    Plaintiff's DMCA Claims and Subpoena

Plaintiff filed a request to the Clerk for Issuance of a Subpoena Pursuant to 17 U.S.C. § 512(h) to identify alleged copyright infringers of Plaintiff's wrestling content. *See* Doc. 1. Plaintiff served a subpoena under Federal Rule of Civil Procedure 45 and 17 U.S.C. § 512(h) addressed to TTI, TikTok Pte. Ltd, and TikTok U.S. Data Security Inc. ("Subpoena"). [x] Decl., ¶ [x]. TTI informed Plaintiff it was the correct entity for service, and the Parties agreed the other entities that received the subpoena would have no obligation to provide a further response. *Id.* ¶ [x].

TTI's counsel has on multiple occasions conferred with the pro se Plaintiff about the Subpoena's scope, including a Local Rule 37-1 prefiling conference of counsel on [x]. *Id.* ¶ [x]. TTI and Plaintiff agreed the Subpoena's scope would be limited to the production of BSI for the identified accounts. *Id.* ¶ [x].

4

**B.      Plaintiff's Refusal to Stipulate to a Protective Order**

During the conferrals, including the Rule 37-1 conference, TTI agreed to produce the BSI subject to a protective order and said it was willing to confer regarding any edits Plaintiff believed were necessary to pursue his claims.  But pro se Plaintiff consistently refused to agree to entry of any protective order. *Id.* ¶ [x]. TTI's counsel explained much of the information and arguments contained in this Stipulation, including that a protective order is common for BSI productions, especially when the account owners are unknown and unable to assert objections. *Id.* ¶ [x]. Plaintiff took the position that he will need to use this information to identify and pursue claims against the account owners and, therefore, it should not be subject to any disclosure restrictions. *Id.* ¶ [x].

## STANDARD

"Third party subpoenas under Federal Rule of Civil Procedure 45 are also subject to the limitations of Federal Rule of Civil Procedure 26." *Jacoby v. Board of Supervisors of Univ. of La. System*, 709 F.Supp.3d 1087, 1090 (E.D. Cal. 2023). After a party moves for the entry of a protective order, the trial court may grant the request to protect persons from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c)(1). Protective orders are necessary to protect parties and witnesses in view of broad discovery rights. *U.S. v. CBS, Inc.*, 666 F.2d 364, 368-39 (9th Cir. 1982). The party moving for a protective order must show there is "good cause" for its issuance. Fed. R. Civ. P. 26(c)(1).

These concerns are particularly applicable for third parties responding to subpoenas. Indeed, Rule 45(d)(1) emphasizes that parties "responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." District courts "must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." *Id.*; *see also Jacoby*, 709 F.Supp. at 1089 ("The Federal Rules specifically require parties to avoid creating undue burdens on third parties via subpoenas.").

## **ARGUMENT**

Good cause exists for entry of a protective order. TTI seeks to protect the unknown account owners from unnecessary annoyance, embarrassment, or oppression caused by the unrestrained disclosure of their BSI, and proactively safeguard against any potential unknown issues. This position is consistent with decisions from many federal courts, which have entered protective orders when a subpoena is issued for subscriber information to identify potential defendants.

For example, in *Strike 3 Holdings, LLC v. John Doe*, No. 18-cv-02019, 2019 WL 591460 (N.D. Cal. Feb. 13, 2019), the Northern District of California entered a protective order *sua sponte* to protect internet service provider users who may have infringed on a motion picture producer's copyrighted material. *Id.* at *3. The Northern District of California found a protective order was warranted for two reasons. First, the court sought to protect potentially innocent third parties, who may not have been the individuals that

infringed on plaintiff's copyright, as the actual infringer may have impermissibly used the subscriber's IP address to access copyrighted files. *Id.* Second, since the plaintiff alleged the user illegally downloaded adult motion pictures, the court acknowledged a future defendant may want to proceed pseudonymously where "necessary to preserve privacy in a matter of a sensitive and highly personal nature." *Id.* Courts around the country have entered protective orders in similar circumstances. *See, e.g.*, *Strike 3 Holdings, LLC* , 740 F. Supp. 3d at 127 (requiring protective order before production of subscriber information to identify alleged copyright infringer); *Strike 3 Holdings, LLC*, 2023 WL 4922590, at *4 (entering protective order "to protect the respective interests of the parties and non-parties").

Like the subpoenas at issue in those cases, TikTok requests a protective order here to safeguard information from currently unknown individuals who are unable to protect their rights. This Court should take this reasonable step to protect the information of potentially innocent third parties, who may not even be the people who allegedly infringed on Plaintiff's copyright. *See Strike 3 Holdings, LLC*, 2019 WL 591460, at *3. Whether they are ultimately able to proceed anonymously and whether other potential objections may exist are issues this Court does not need to decide at this time. Entering a protective order at this stage is a reasonable step to protect against currently unknown interests, objections, and other issues for the unidentified parties. Accordingly, good cause exists for the Court to issue a protective order prior to TTI producing BSI.

## CONCLUSION

For the foregoing reasons, TTI respectfully requests the Court enter the protective order attached as Exhibit A before TTI produces BSI in this case.

## PLAINTIFF NIMA GHARAVI'S POSITION

Dated:        March ___, 2025                FAEGRE DRINKER BIDDLE & REATH LLP


By:_____
    [insert]

Attorneys for Defendant
TIKTOK INC.


Dated:        March ___, 2025


By:_____
    Nima Gharavi

*Pro se*

# Exhibit B Attachment:

# Exhibit 9

**Nima Gharavi**

| | |
|---|---|
| **From:** | Google Play <googleplay-noreply@google.com> |
| **Sent:** | Wednesday, January 1, 2025 6:54 PM |
| **To:** | Nima Gharavi |
| **Subject:** | Your Google Play Order Receipt from Jan 1, 2025 |

[External email - use caution]



# Thank you

You've made a subscription purchase from TikTok Pte. Ltd. on Google Play. You will be **automatically charged $2.69 for 1 month, then $2.99/month** starting Feb 2, 2025, unless canceled. You can cancel anytime. Manage your subscriptions

To help keep your subscription active, add a backup payment method.

Add backup

**Order number:** ███████████████-16854
**Order date:** Jan 1, 2025 7:53:53 PM EST
**Your account:** nima@████████

| Item | Price |
|---|---|
| Fantastic videos#5846 (TikTok) | $2.69 |
| Auto-renewing subscription | |

State sales tax: $0.17

Local sales tax: $0.11

Total: $2.97

**Payment method:**

1

By subscribing, you authorize us to charge you the subscription cost (as described above) automatically, charged to the payment method provided until canceled. <u>Learn how to cancel</u>. Keep this for your records.

Questions? Visit <u>TikTok Pte. Ltd.</u>.

 **Google Play**

All your entertainment in one place, available anywhere. Learn more ›

See your Google Play Order History.

View the Google Play Refund Policy and the Terms of Service.

© 2025 Google | All Rights Reserved.

Google LLC, 1600 Amphitheatre Pkwy, Mountain View, CA, 94043, United States

Please don't reply to this email, as we are unable to respond from this email address. If you need support, visit the Google Play Help Center.


# Fantastic videos's community

73 subscribers

| Community | Benefits | Space |
| --- | --- | --- |

## Your subscription info

Plan: Basic 1

Duration: 1 day

Renews on: Feb 1, 2025

Community badge: SUB

## Your community identity

Badge in video comments



Badge in LIVE comments



**Extend your subscription**

**Cancel subscription**

# Fantastic videos's community

73 subscribers

Community     **Benefits**     Space

## Customized perks (4)



**Sub-only videos**
The creator will post sub-only videos regularly.



**Multi-guest requests**
The creator will prioritize their subscribers' multi-guest requests.



**Direct messages**
The creator will prioritize replying to the subscribers' direct messages.



**Comment response**
The creator will prioritize responding to the subscribers' comments.

Written and administered by the creator only. ⓘ

## Sub-only videos (38)                                    ›

The creator will upload videos visible only to subscribers.



Written and administered by the creator only.

## Fantastic videos's stickers (5)



## Sub-only note

Thank you very much to those who subscribed, you help a lot to keep the channel open, feel free to send messages.

**Extend your subscription**

**Cancel subscription**



< 

# Fantastic videos's community

73 subscribers

Community       Benefits       **Space**

## Featured

See all threads >



Enter the creator's sub-only space to see more!

**Enter**

**Extend your subscription**

**Cancel subscription**

# Receipt



DATE

02 January 2025

NUMBER

▅▅▅541

BILL TO

Midwest Wrestle

Chicago Illinois ▅▅▅
United States

INTERPROMO GMBH

Holzhofstr. 1,
76530, Baden–Baden, Germany
VAT: DE310729892
www.4kdownload.com

| ITEM | QUANTITY | AMOUNT |
|---|---|---|
| 4K Tokkit Personal | 1 | $20.0 |

You can contact us with any questions by emailing
support@4kdownload.com

TOTAL

$20